CHARLES E. CAMPBELL, EMMA WYATT, WILLIAM F. HARRA, JULIA S. COX, AMOS HARRA, ELIZABETH LATIMER, RAYMOND HARRA, FRANCES HARRA, BURL JOHNSON, FRANK L. HARRA, NETTIE HARRA, AUGUSTA HARRA LAWRENCE, Plaintiffs-Respondents, v. LULA WEBB, Individually and as Administratrix of the Estate of Lewis Webb, Deceased, Defendants-Appellants, No. 42904—258 S. W. (2d) 595.

Division One, May 11, 1953.

Motions for Rehearing or to Transfer to Banc or to Modify Opinion Overruled, June 8, 1953.

1194

*David H. Bresler, Henry Riederer* and *Harry A. Hall* for appellant.

*Rufus Burrus, Donald W. Johnson* and *Charles V. Garnett* for respondents.

COIL, C.—This is the second appeal. Campbell v. Webb, 356 Mo. 466, 202 S.W. 2d 35, should be read in connection with this opinion.

On November 12, 1941, twelve named plaintiffs (whose names still appear as plaintiffs in the above caption) instituted an action for damages against Lewis Webb for an alleged breach of a contract relating to the handling and sale of what is hereinafter referred to as the Smith farm. This contract was executed by Webb as second party and by plaintiffs and fifteen others (including plaintiffs and present defendant-appellant, Lula Webb) as first parties, who were alleged to be heirs of one Frank Harra who had died single and intestate owning the Smith farm. By the terms of the contract, the first parties conveyed their interests in the Smith farm to Webb on the condition that if it was sold within five years the proceeds of sale less a maximum sum of $25,600 (the amount of a then-existing encumbrance) would be paid to first parties, who were all but four of the heirs of Frank Harra, deceased.

On May 6, 1942, Lewis Webb died, and the action was revived against his widow, Lula Webb, as administratrix. Two of the named plaintiffs died before the first trial and their personal representatives were not substituted as parties. On December 7, 1945, a third amended petition in two counts was filed in which, so far as the caption thereof was concerned, plaintiffs remained the same; Lula Webb in her individual capacity was joined as a defendant; and in each count it was alleged in part: "Plaintiffs herein, by leave of court first had and obtained, file this petition for and on behalf of themselves as individuals and representatives of all of the heirs of one Frank Harra, deceased, and all of whom entered into a written contract with Lewis S. Webb, * * *. That these plaintiffs fairly insure adequate representation of all of the class. That the object of the

action is the adjudication of a claim which affects specific property and rights under a single contract and there is a common question of law and fact affecting the several rights of the plaintiff and those of the whole class and a common relief is sought.''

A pre-first trial order directed separate trials, count 1 to be tried at law and count 2 in equity. Count 1 was tried in April, 1946. The evidence was that the Smith farm had been sold to the United States for' $62,400 and that no amount had been paid by Lewis Webb to any plaintiff, any heir, or any first party to the contract. The trial court directed a verdict for plaintiffs **[598]** in the sum of $36,800 ($62,400 less $25,600), with interest thereon at 6% from January 28, 1941, and entered a judgment which permitted recovery by the surviving plaintiffs on behalf of themselves and all others who had an interest in the proceeds of the sale of the Smith farm either as heirs or under the contract.

Among other things, our opinion in Campbell v. Webb, supra, adjudicated: (1) that Lewis Webb sold the Smith farm within the 5-year period referred to in the contract and was obligated to pay the proceeds of the sale, less $25,600, to first parties; (2) that the trial court erred in entering judgments for any others than the surviving named plaintiffs for the amounts of their respective damages. The judgment was reversed and the cause remanded for further proceedings not inconsistent with that opinion.

On January 8, 1950, a second trial was had. The evidence therein will be referred to in more detail later. Suffice now to say that the evidence was that a portion of the proceeds of the sale of the Smith farm was used by Lewis Webb to pay an encumbrance on another farm (referred to hereinafter as the home place) held by Lewis and Lula Webb by the entirety, and in the purchase of U. S. bonds in the names of Lewis and Lula Webb.

The trial court made findings of fact and declarations of law, the effects of which were included in a judgment and decree which adjudged that the ten surviving named plaintiffs, or their duly substituted personal representatives, recover on count 1 from Lula Webb as administratrix in amounts representing their respective interests in the sale proceeds; that count 2 be sustained as a class action on behalf of plaintiffs and all other heirs of Frank Harra; and that the representative plaintiffs recover from Lula Webb as an individual $34,500 (the difference between $62,400 and $25,600 less the interest of Lula Webb as a first party to the contract), with interest from January 28, 1941, the total recovery to be apportioned among the members of the class according to their respective interests. Plaintiffs were given an equitable lien upon certain U. S. bonds and upon the home place as security for their respective judgments.

The first question is whether count 2 is a proper class action wherein the named plaintiffs and duly substituted administrators can recover on behalf of themselves and all other Harra heirs.

It will be recalled that count 2 was an action against Lula Webb, both as administratrix of Lewis Webb's estate and as an individual. We have noted the allegations of both counts as to a class action. It is important now to note the averments of count 2, some contained in and some not contained in count 1. Count 2 averred, in substance, that Frank Harra died single and intestate owning the Smith farm; that upon his death the farm vested in parties named therein (their particular interests were alleged); that when Harra died, the farm was subject to a mortgage securing a $25,600 note; that named plaintiffs and other heirs conveyed their respective interests to Webb in trust, upon the condition that, if the farm was sold within five years, Webb would convey to the purchaser and pay the sale proceeds, less $25,600, to the heirs; that Webb sold the farm within five years for $62,400 but failed to pay to the heirs any of the proceeds; that the proceeds had reached the possession of Lula Webb; that parts of the proceeds were used to satisfy the obligation of a deed of trust on the home place and to buy U. S. bonds in the names of Lewis Webb and Lula Webb; that the home place and bonds, since the death of Lewis Webb, had become the sole property of Lula Webb. Plaintiffs prayed that an accounting be made by Lula Webb, both as administratrix and as an individual, as to the $62,400, that a money judgment be entered against her as administratrix and individually for the amount found to be due, and that an equitable lien be impressed on the home place and the bonds.

On the prior appeal we held that count 1 (against the administratrix only) could not be maintained as a class action. This, because on December 7, 1945 (the time when it was first sought to convert the original suit into a class action), the claims [599] of all heirs and parties to the contract who had not been named as plaintiffs in the original petition were barred by virtue of the one-year statute of limitations. RSMo 1949, § 464.020, V.A.M.S. We declined to determine whether otherwise a class action could have been properly maintained. The holding in our prior opinion that the claims of others than named surviving plaintiffs were barred, effectively barred the right of plaintiffs to maintain a class action on count 2 in so far as that count sought recovery against the administratrix of the Webb estate. This because, if the claims of all others than the named surviving plaintiffs were barred as against the estate under count 1, they were likewise barred as against the estate under count 2, even though count 2 was in equity. Statutes of limitations apply alike to legal and equitable actions. Ludwig v. Scott, Mo. Sup., 65 S.W.

2d 1034, 1035[1-3]; Simmons v. Friday, 359 Mo. 812, 826, 224 S.W. 2d 90, 99[22, 23].

But, as noted, judgment was entered on count 2 against Lula Webb individually and not as administratrix. So, the question remains as to whether an equitable class action against Lula Webb as an individual could be properly maintained by the named surviving plaintiffs and their properly substituted personal representatives, on behalf of themselves and all of the other Harra heirs.

Class actions are provided for by RSMo 1949, § 507.070, V.A.M.S., as supplemented by Supreme Court Rule 3.07. Three types of class actions are described. Among the conditions precedent to the maintenance of any type of class action are these: that the persons constituting a class are very numerous or that it is impracticable to bring them all before the court; that the persons bringing the action shall fairly insure the adequate representation of all on behalf of whom they sue; and that facts showing such adequate and fair representation must be alleged and proved.

(The contract provides that the proceeds of the sale of the Smith farm shall be paid to the "first parties," and not that the first parties shall be paid amounts according to their respective interests as heirs of Frank Harra. Our prior opinion held that the interests were several. And, as instant appellants apparently agree that their claims may be determined by their respective interests in the Smith farm as Harra's heirs, we shall assume ·without deciding that the class with which we are now concerned are the Harra heirs—and not the class composed of the "first parties.")

When the third amended petition was filed (more than four years after the original action was filed by 12 plaintiffs), an attempt was made to convert the case into a class action. At that time there were, according to the petition, a total of 20 persons, including plaintiffs (all were named by plaintiffs) who were alleged to be the class which the 12 plaintiffs represented. (As noted, there were 27 "first parties.") There was no allegation to the effect that, or direct or circumstantial evidence from which it could be inferred that, it was or would have been impracticable to have brought all the alleged members of the class before the court. Section 507.070, supra, uses this language: "If persons constituting a class are very numerous or it is impracticable to bring them all before the court, * * *." (Italics ours.) This language makes plain that either reason is sufficient, that is, either that the parties are very numerous, or that it is impracticable to bring them all before the court. It seems apparent, however, that the determination of how many people there need be before they may be said to be "very numerous" must depend upon the circumstances in a given case. Certainly, it seems that in determining whether persons constituting a class are "very numerous", one circumstance to be considered is whether the very *number* of parties

makes it impracticable to bring them all before the court. Parties may be so numerous that their number alone may furnish a sufficient basis for a determination that the parties are "very numerous" within the meaning of Section 507.070. But "impracticability" is always to be considered in determining whether parties are "very numerous".

Our code provision as to class actions is substantially a copy of Federal Rule 23. True, the Federal [600] Rule uses language in some respects different in stating the first conditions precedent. Rule 23 says: "If persons constituting a class are so numerous as to make it impracticable to bring them all before the court" etc., while, as noted, our Section 507.070 provides: "If persons constituting a class are very numerous *or* it is impracticable to bring them all before the court * * *." (Italics ours.) We think, however, it is reasonable to say that the difference in the language used in our code as compared to the language of the Federal Rule was to make it clear by our code provision that it might be impracticable to bring all the parties before the court for some reason other than the fact that the parties are very numerous. Our code provision, reasonably construed, would seem to mean that although numerousness of parties alone is sufficient to satisfy one condition precedent, that, nevertheless, whether the number is sufficient to constitute parties "very numerous" must depend upon the existence of some reason of necessity or desirability or practicability.

There was no apparent reason of necessity or desirability or practicability in the present case to justify the conversion of this action into a class action. Upon the record here, we must hold that the parties constituting the class are not "very numerous" within the meaning of Section 507.070, and that it was not for any other reason impracticable to bring them all into court. See, Jackman v. Union Pac. R. Co., Mo. W.D., 4 F.R.D. 172, an action for wrongful death due to the alleged negligence of the defendant. The action was instituted by a plaintiff who described himself to be an heir of deceased and who alleged that he brought the action on his own and on behalf of deceased's other heirs, naming them. The statutes of Idaho, where the death occurred, permitted actions for wrongful death by the heirs of the deceased. On the question of whether plaintiff could maintain the action as a class action, the court said at page 174: "The plaintiff is able to name each of the seven other heirs of the decedent. There is no reason why these interested parties should not be brought into court and made parties plaintiff. The plaintiff is not confronted with an impracticable situation. It was not the design of the rule to permit class actions as the facts are presented here. Moreover, there is no averment or an assignment of a reason why all the heirs are not made parties plaintiff.

"The plaintiff ought to justify in some manner his effort to invoke this rule."

Section 570.030 provides in part that where one who should be joined as a plaintiff refuses to do so or his consent cannot be obtained, he may be made a defendant. Section 507.040 provides for the permissive joinder of parties in one action if they assert a right to relief jointly or severally arising out of the same transaction wherein there is any common question of law or fact. And Section 507.090 provides for intervention. We cannot on this record find any justification for sustaining count 2 as a class action. There appears no logical reason why all the interested parties were not made parties to the action. For four years plaintiffs numbered only twelve; no class action under the doctrine of virtual representation in equity (to be next discussed) was attempted; and during those four years the other heirs, all available, were not made parties plaintiff or defendant either before or after the effective date of the new code.

Plaintiffs-respondents say, however, that it is unimportant whether the action in count 2 is or is not a class action under Section 507.070. (Plaintiffs, however, contended below that their class action was pursuant to that section.) Respondents say now that the principle upon which they seek to sustain the right of named plaintiffs to recover for themselves and the other Harra heirs, is that known as equitable representation or virtual representation in equity; that the purpose of Section 507.070, "was merely to extend the equitable doctrine of class actions and to make that doctrine applicable, under certain expressed conditions, to actions at law. The purpose of the code was not to impair the equitable rule, but to enlarge it and extend it to all civil actions whether legal or equitable."

But we need not decide whether Section 507.070 superseded and encompassed within [601] it the equitable doctrine of virtual representation. The reasons which we have assigned as to the impropriety of the class action under the code are equally appropriate and decisive as to the impropriety of a class action under the equitable doctrine of virtual representation. Indeed, all that respondents point to as a requirement for a class action under the code, to distinguish such from a class action under the doctrine of virtual representation, is the requirement of Supreme Court Rule 3.07 that in statutory class actions there must be allegations and proof of facts which show that the plaintiffs adequately and fairly represent the class they purport to represent. But we have not ruled the asserted class action feature of this case on any lack of allegation or proof as to the fairness or adequacy of the representation. We have ruled that the conditions precedent—the facts of very numerous parties or the impracticability of all of those parties being before the court—have not been shown either by direct or circumstantial evidence or from anything else in the record which could reasonably be a justification for a class action. In fact, if an inference is to be drawn either way, it must, on this record, be that there was no reason why these

parties were not all before the court either as plaintiffs or defendants. And, as we understand, the doctrine of virtual representation in equity has always been based upon the existence of some necessity or adequate reason for departing from the usual desirability of making all those parties to an' action whose rights or duties will or may be affected by a judgment. The basis for the application of the doctrine is to provide for those instances in which the application of the usual rule would result in great injustice. The doctrine has been applied in those cases where the exigencies of a particular situation outweigh the normal desirability of having all persons affected by a judgment before the court as parties. In Rest., Judgments, § 86, p. 416, is the following comment with reference to representative suits as recognized in equity:

"A class action is an illustration of a situation where it is *not feasible* for all persons whose interests may be affected by an action to be made parties to it. *It was invented by equity for situations in which the number of persons having substantially identical interests in the subject matter or litigation is so great that it is impracticable to join all of them as parties, in accordance with the usual rules of procedure, and in which an issue is raised which is common to all of such persons.*" (Italics ours.) And see Pomeroy's Eq. Juris., Fifth Ed., Introd. Ch., Vol. 1, § 114, p. 152.

We hold that count 2 under the facts and circumstances of this case could not be converted into a class action under Section 507.070, or into a representative action under the equitable doctrine of virtual representation.

The next question is whether count 2 stated a claim in equity against Lula Webb individually on behalf of the named plaintiffs and the properly substituted personal representatives of deceased named plaintiffs. It is apparent that count 2 did state a claim in equity against Lula Webb as an individual, in that it charged in substance that she became a constructive trustee for plaintiffs of money, bonds, and an interest in real estate. Although plaintiffs by count 1 proceeded against Lewis Webb for breach of contract, the terms of the contract, as alleged by plaintiffs in count 2, made Lewis Webb trustee for plaintiffs of a portion of the proceeds of the sale of the Smith farm. By virtue of the contract Lewis Webb became trustee of $36,800 which it was his express duty to pay over to the signatory first parties. This he failed to do. On the contrary, a review of the evidence shows he converted some of the trust funds into bonds, used some to pay an obligation on the home place, and some to discharge an encumbrance on other real estate. These bonds and these benefits were transferred to Lula by Lewis in breach of his trust obligation to the beneficiary first parties. Lula then, became a constructive trustee for plaintiffs of the bonds, of an equitable interest in the home place, and of an equitable interest in other real estate.

Pomeroy's Eq. Juris., Fifth Ed., Vol. 4, § 1048, p. 102; Rest., Trusts, § 294, p. 897; Clifford Banking Co. v. Donovan Commission Co., 195 Mo. 262, 288-290, 94 S.W. [602] 527, 535; Newco Land Co. v. Martin, 358 Mo. 99, 107[1], 213 S.W. 2d 504, 509[2]. ·Admittedly, Lula Webb was a transferee with notice of the character of the property received because she was a first party to the contract and because she had actual knowledge that trust funds had been used by Lewis Webb to obtain property and benefits transferred to her. Rest., Trusts, Ch. 9, § 297, p. 904.

Count 2, however, did not seek a return of trust property in its original or changed form but, on the contrary, sought an accounting and a money judgment against Lula individually for the value of the trust property traced to her, as well as an equitable lien on the property still retained by her. Whether the action be called one for money had and received as a means to enforce a constructive trust or an action in equity to trace trust property is unimportant. An action for money had and received is a proper way to enforce a constructive trust. Bogert, Trusts and Trustees, Vol. 3, Ch. 24, § 472, p. 19; Clifford Banking Co. v. Donovan Commission Co., supra; Eichenberg v. Magidson's Estate, Mo. App., 170 S.W. 2d 105, 108; Newco Land Co. v. Martin, supra.

The basis for the amount of a money judgment against Lula Webb as an individual is the value of the trust property which was received by her. She, as constructive trustee, is liable only for the value of the property traced to her possession. Bogert, Trusts and Trustees, Vol. 4, Ch. 41, § 862, p. 411; 54 Am. Jur., Trusts, § 254, p. 197; Hunter v. Hunter, 50 Mo. 445.

The evidence clearly shows that the $62,400, the proceeds. of the sale of the Smith farm, was paid out through the agency of a title company by a series of checks dated January 28, 1941, and by two checks dated February 10, 1941. Five checks to Lewis S. Webb and Lula L. Webb totaled $42,351.84. A check for $6,360 was issued to the tenant on the Smith farm as damages for loss of growing crops in order to give the purchaser immediate possession. Another was issued to the Federal Land Bank for $13,547.16 which, it is conceded, was in payment of the then-existing encumbrance on the Smith farm, which had been reduced from $25,600 as it existed at the time of the contract. Another for $42.75 was issued to a circuit clerk for court costs of some kind, and another for $98.75 to the title company for certain of its expenses. Now, the evidence showed that of the $42,351.84 received by checks payable to the Webbs, $17,500 was used by Lewis Webb to purchase U. S. bonds which were placed either·in his name, payable to Lula Webb on his death, or in the name of Lula Webb, payable to Lewis Webb on her death. These bonds became the property of Lula Webb upon the death of her husband. The evidence also clearly showed that of the $42,351.84

received by the Webbs, $15,941.07 was paid to the Federal Land Bank to satisfy a deed of trust on the home place which had been placed thereon under circumstances and for a purpose to be hereinafter considered. And the evidence further showed that $3,000 of the $42,351.84 was paid to a Mrs. Sneed. As we understand, the transaction involving this $3,000 paid to Mrs. Sneed was this: Lula Webb inherited 40 acres of land from her father; the land was subject to a $6,000 debt; Lewis Webb, to satisfy the encumbrance, paid Mrs. Sneed $3,000 and Lewis and Lula deeded to her 20 of the 40 acres. The other 20 acres, cleared of encumbrance, remained in Lula's possession. This real estate was not identified, however, and no lien was impressed thereon by the judgment below.

Thus, there was clear and cogent proof of the disposition of $36,441.07 of the total amount paid to the Webbs. There was no satisfactory evidence as to the disposition of the balance, $5,910.77; it was shown that $4,346.84 was deposited in a joint account of Lewis and Lula Webb; that the remaining balance ($1,563.93) apparently was part of an $18,000 check deposited in an account of Lewis Webb, $15,941.07 of which was used to pay the mortgage on the home place and $1,000 of which made up part of the $17,500 paid for bonds. While the item of $4,346.84 was deposited in an account carried in the names of Lewis and Lula Webb, the evidence was that the deposit was made by Lewis Webb. The witness was unable to say who drew checks [603] on the account. The ledger sheets indicated that various checks were drawn which exhausted the $4,346.84 deposit, but there was no evidence as to the payees of these checks or for what purposes they were issued. Under such circumstances, we are of the opinion that it may not be said that Lula Webb received or had in her possession as an individual this $4,346.84. Nor was the evidence as to this item sufficient to require Lula Webb to account to plaintiffs for this amount. Plaintiffs did not proceed on the theory that Lewis and Lula Webb were cotrustees of the entire proceeds, but rather, as noted, have proceeded to obtain a money judgment for, and an equitable lien upon, property which may be traced into her hands on the theory that she has been unjustly enriched to that extent.

We turn to the evidence as to the circumstances of the $15,941.07 payment to the Federal Land Bank to satisfy the deed of trust on the home place. The evidence showed that the home place (a farm consisting of approximately 500 acres) was received by Lula Webb from her father's estate and thereafter Lewis Webb and Lula Webb held it in an estate by the entirety. The contract with Lewis Webb was dated October 9, 1935. Frank Harra died in October, 1933. Mrs. Webb testified, without contradiction by any party plaintiff or by any other heir, that from the time of Frank's death until the contract was executed in October, 1935, there were many meetings

among the heirs in an attempt to arrange for the handling of various pieces of real estate left by Frank Harra; that one of these was the Smith farm, subject to the $25,600 mortgage; that about three or four months after Frank's death, Lewis Webb took over the handling of the Smith farm under an oral agreement and understanding with the heirs that he would in some manner refinance so that it would not be sold under foreclosure; that Lewis Webb did so and operated the farm from a time three or four months after Frank's death until the oral understanding was culminated in the written contract on October 9, 1935; that during this period of time (the record shows in April, 1934), Lewis Webb caused to be executed by himself and Lula a farm deed of trust on the home place to secure a note in the sum of $17,500; that the proceeds of this loan were used by Lewis Webb in refinancing, rehabilitating, and protecting the Smith farm from foreclosure.

Now, Lewis Webb was obligated by the terms of the contract to pay to first parties the difference between $62,400 and $25,600, irrespective of whether he had incurred liabilities in the operation of the Smith farm in excess of $25,600. But we are not now concerned with the liability of Lewis Webb or his estate to plaintiffs; we are here concerned only with the liability of Lula Webb as an individual. The note for $25,600 had been reduced at the time of the sale of the Smith farm to the United States to the amount of $13,547.16. Thus, when effect is given to the undisputed testimony of Lula Webb that the proceeds of the $17,500 loan on the home place were used to refinance the Smith farm, it would be unreasonable to assume that the $15,941.07 which was paid from the trust funds to satisfy the deed of trust on the home place, was other than an expenditure, a portion of which at least, Lewis Webb was entitled to make by virtue of the terms of his contract. The contract provided in effect that in no event would the proceeds of the sale be reduced by a deduction in excess of $25,600. Thus, if the $13,547.16 payment to discharge the mortgage on the Smith farm is subtracted from the total amount of that mortgage when Lewis Webb took it over, namely, $25,600, there remains the sum of $12,052.84 which, under the evidence in this record, so far as Lula Webb is concerned, may not be said to have been wrongfully applied in making up a part of the $15,941.07 necessary to satisfy the mortgage on the home place. We may not say on the basis of the evidence adduced that plaintiffs have successfully shown that the full amount of $15,941.07 was a fund to which Mrs. Webb was not entitled or was paid by Lewis Webb in breach of trust. It is more reasonable to say that $12,052.84 was properly a part of the $25,600 which under the contract Webb could rightfully apply [604] to the discharge of encumbrances. This credit of $12,052.84, subtracted from $15,941.07, the amount of the payment to pay the home place encumbrance, leaves

$3,888.23 which, so far as Lula Webb is concerned, was a transfer to her of trust property.

And this $3,888.23, together with the $17,500 (plus accrued value of the bonds), used to purchase bonds, and the $3,000 payment to Mrs. Sneed, make up the total amount of the principal of the money judgment to which plaintiffs could be entitled against Lula Webb as an individual. And plaintiffs are entitled to equitable liens on the bonds and on the home place to the extent hereinafter noted. Bogert, Trusts and Trustees, Vol. 4, Ch. 41, § 865, p. 434; Liflander v. Bobbitt, Mo. Sup., 111 S.W. 2d 72, 75[5, 6]; Miller v. Heisler, Mo. App., 187 S.W. 2d 485, 491[10, 11]; Newco Land Co. v. Martin, supra, 213 S.W. 2d 515[20]. As stated, no sufficient identification was made of the 20 acres involved in the Sneed transaction to enable the trial court to impress an equitable lien thereon.

Appellants' contention that any action against Lula Webb as an individual was barred by reason of the 5-year statute of limitations is untenable. Appellants say that Mrs. Webb was not a party to the action until April 18, 1946, and that plaintiffs' cause of action accrued prior to April 18, 1941. The record clearly shows, however, that Lula Webb was made an individual party defendant on December 7, 1945, which was well within the 5-year period of limitations.

Appellants also urge that plaintiffs-respondents, by having proceeded on the first count for a money judgment against Lewis Webb for breach of contract, made an election of remedy inconsistent with a proceeding in equity against Mrs. Webb as an individual for a money judgment and an equitable lien. Under count 1 certain beneficiaries of a trust fund sued the express trustee for damages for breach of trust and have obtained judgments against him. That action, however, did not preclude the same or other beneficiaries from also maintaining an action against the transferee of all or part of the trust fund so long as the judgments obtained on count 1 had not been satisfied. In other words, a beneficiary has, under certain circumstances, concurrent remedies available to him on account of the same breach of trust. If he pursues these remedies simultaneously or in a certain order, he has not pursued inconsistent remedies or made an election so long as double compensation is not threatened, or another has not actually been misled by his conduct, or the facts necessary as a basis for the second remedy are not res judicata by reason of an adjudication of fact issues in the pursuance of another remedy. Mann v. Bank of Greenfield, 323 Mo. 1000, 1013[VI], 20 S.W. 2d 502, 508[11, 12]; Davis v. Hauschild, Mo. Sup., 243 S.W. 2d 956, 959[2-4]; Bogert, Trusts and Trustees, Vol. 4, Ch. 45, §§ 945, pp. 162, 163, 946, p. 175; Rest., Trusts, Ch. 9, § 295, Comments a, b, c, pp. 900, 901; 54 Am. Jur., Trusts, § 250, p. 194.

Appellants urge that the judgments are fatally defective because the evidence was that Frank Harra owned only a one-half

interest in the Smith farm and the judgments are based upon the assumption of his full ownership. Frank Harra's interest, however, is not material except in so far as the plaintiffs themselves apparently have agreed and have alleged that the amounts of their respective judgments are to be determined by their status as Harra's heirs. The basis for recovery, on both counts 1 and 2, is the contract. The claim or claims of the first parties to the contract were not to establish interests in real estate, but were to recover money. Thus, whether Frank Harra held the entire title or only a one-half interest has no primary relationship to Webb's contractual obligations.

▮ Appellants' final contention is that Nettie Harra, Frances Harra, and Lois McGuire, for whom judgments were entered on one or both counts, were not heirs of Frank Harra; that Frances and Nettie Harra were surviving spouses of heirs, and that Lois McGuire was a deceased heir's daughter. Appellants say [605] that, inasmuch as any claims the deceased husbands or father may have had against Webb passed as personalty to their personal representatives and did not descend as interests in real estate, these parties could not recover. We may eliminate Lois McGuire because she was never a party plaintiff and consequently may not recover. However, as both first parties to the contract and parties plaintiff, Nettie and Frances had claims against Webb for breach of contract. Webb's agreement was with them as well as the other first parties. The rights of each to recover against the Webbs is determined by their status as contracting parties.

▮ William F. Harra and Elizabeth Latimer, named plaintiffs, had died before the first trial on count 1 and in the former opinion, it was said: "Apparently, the cause was not revived as to either of these parties." Upon remand, separate motions were filed for orders substituting as parties plaintiff the respective administrators of William Harra and Elizabeth Latimer. The trial judge to whom these motions were presented denied them on the ground that they were made more than a year after the deaths. However, the instant judgment provides for recovery on count 2 by these administrators. Inasmuch as we have held that plaintiffs could not properly maintain a class action on count 2, it is necessary to determine whether these administrators should have been substituted as parties plaintiff.

William F. Harra died May 15, 1944, and motion for order of substitution was filed June 6, 1947. Elizabeth Latimer died December 26, 1945, and motion for order of substitution was filed August 26, 1947. Section 507.100—1.(1), effective January 1, 1945, provides in part that, "If a party dies and the claim is not thereby extinguished, the court shall on motion order substitution of the proper parties. * * *." (3). "If the death occurs prior to final judgment or after final judgment and before appeal and substitution or motion therefor is not made within one year after the death, the action shall be dismissed as to the deceased party; * * *." Supreme Court Rule 3.08

provides in part: "If substitution or motion therefor is not made within one year after the death of a party prior to judgment, the action shall be dismissed as to the deceased party; * * *."

Respondents urge: That this suit was instituted (November 12, 1941) before the adoption of the code, effective January 1, 1945; that in 1941 the revivor limitations period ran from the date of suggestion of death rather than from the date of death (RSMo 1939, § 1042); that Section 3 of the code as originally enacted, Laws of Missouri 1943, p. 357, provided that the code would govern proceedings then pending "except to the extent that in the opinion of the court its application in a particular action pending when this code takes effect would not be feasible or would work injustice, in which event the former procedure applies"; that the situation in the present case is one wherein the application of the provisions of Section 507.100 would be unjust.

Respondents argue that the injustice is this: The heirs considered themselves in court by a representative action until our decision on the prior appeal; that, inasmuch as the applications for orders of substitution were filed about two and four months, respectively, after our mandate in that case reached the trial court, application of the 1-year limitation would be unjust.

We note that Section 3 of the code, supra, was repealed in 1949. Laws of Missouri 1949, H.B. 2116. But, in any event, the two parties with whom we are here dealing were named parties plaintiff in the action as originally instituted and were still named parties when the attempt was made to convert to a class action on December 7, 1945, although by that time (it was later shown) William F. Harra had died. Thus, these two parties were among the plaintiffs who allegedly represented the class. Their administrators would not automatically become members of that class. It was encumbent upon the administrators to obtain orders of substitution. The personal representatives could not reasonably assume that they would ipso facto be in court as members of the class. The application for substitution for William F. Harra was not filed until more than three years [606] after his death, and 2½ years after the effective date of the new code. The application for substitution for Elizabeth Latimer (who died subsequent to the effective date of the new code) was not filed for one year and 8 months after her death. Repealed Section 1042 and new Section 507.100 are in the nature of special statutes of limitations and the parties had no vested right in a fixed limitation of time. The legislature could properly either extend or reduce the period, subject to the condition "that an adequate means of enforcing the right of action remains and that a reasonable time shall be allowed for the exercise of the right whether existing or prospective, after it comes within the prospective or present operation of the statute and before

the bar becomes effective." Hartvedt v. Maurer, 359 Mo. 16, 20[2] [3], 220 S. W. 2d 55, 57[2], 58[3].

Respondents also urge that the applications for substitution were in time because of the provisions of Section 516.230 which provides in part: "If any action shall have been commenced * * * and the plaintiff therein suffer a nonsuit, or, after a verdict for him, the judgment be arrested, or, after a judgment for him, the same be reversed on appeal or error, such plaintiff may commence a new action from time to time, within one year after such nonsuit suffered or such judgment arrested or reversed; * * *." Again respondents argue that the administrators of the deceased parties plaintiff, automatically became members of the class which the surviving plaintiffs represented; and that when the judgment for all the class was reversed, the administrators had a year in which to commence a new action; and therefore, a year after the date of reversal to apply for an order of substitution. Again this argument overlooks that the parties we are here dealing with were named parties plaintiff, and were not members of the class which the named parties plaintiff sought to represent. Consequently, when William F. Harra and Elizabeth Latimer died and no substitutions were made, the administrators had no judgment to be affirmed or reversed; and this, even if it be assumed that the provisions of Section 516.230 are otherwise applicable.

We hold that no timely applications for substitution were filed by the personal representatives of Elizabeth Latimer or William F. Harra, and that no judgment on either count 1 or count 2 should be entered in their favor.

A judgment should be entered for each of the following parties against Lula Webb, administratrix, in these amounts, with interest on each amount at 6% per annum from January 28, 1941; Elmer A. Latimer, administrator of Amos Harra, deceased, $4,600; Julia S. Cox, $4,600; Joseph Leonard Campbell, administrator de bonis non of Charles E. Campbell, deceased, $2,300; George E. Wyatt, administrator of Emma Wyatt, deceased, $2,300; Raymond Harra, $575; Frank Harra, $575; Augusta Harra Lawrence, $575; Nettie Harra, $575; Burl Johnson, $287.50; and Frances Harra, $191.67.

A judgment should be entered for each of the above named parties against Lula Webb, as an individual, in amounts to be determined as follows: by ascertaining the total present value of the following U. S. bonds: one Series "G" Savings Bond, No. V-9453-G, face value $5,000, one Series "G" Savings Bond, No. V-9466-G, face value $5,000, and ten Series "E" Savings Bonds, Nos. M-94988-E to M-94997-E, inclusive, each of a face value of $1,000; by adding to such amount so determined, the sum of $6,888.23 and interest on $6,888.23 at the rate of 6% per annum from January 28, 1941; and by apportioning the total figure so determined as follows: Elmer

A. Latimer, Administrator of Amos Harra, deceased, 1/8; Julia S. Cox, 1/8; Joseph Leonard Campbell, Administrator de bonis non of Charles E. Campbell, deceased, 1/16; George E. Wyatt, Administrator of Emma Wyatt, deceased, 1/16; Raymond Harra, 1/64; Frank Harra, 1/64; Augusta Harra Lawrence, 1/64; Nettie Harra, 1/64; Burl Johnson, 1/128; Frances Harra, 1/3 of 1/64; such judgments against Mrs. Webb individually should further provide that said parties, respectively, have, to the extent of their proportionate judgments, an equitable lien upon [607] the aforedescribed bonds, and an equitable lien upon the home place to the extent of $3,888.23 with interest on said $3,888.23 at 6% per annum from January 28, 1941, together with proper orders for the enforcement of said liens.

Each judgment against Lula Webb, either as administratrix or individually, should also provide that all amounts recovered in whole or partial satisfaction of either judgment shall be credited upon the other judgment, as the case may be.

Reversed and remanded with directions to enter judgments in accordance with this opinion. *Van Osdol* and *Lozier, CC.*, concur.

PER CURIAM:—The foregoing opinion by COIL, C., is adopted as the opinion of the court. All the judges concur.