The CITY OF LEBANON, Missouri, a Municipal Corporation, Plaintiff-Respondent,

v.

Elmer HOLMAN, Willie Jane Holman, Joe Esther, Fern Esther, Dr. Joseph C. Hughes, Bettie Lou Hughes, John R. Klug, Constance Klug, Defendants-Appellants,

James Blackman, Mildred Blackman, Frank Nelson and Dorothy Nelson, Defendants.

No. 8477.

Springfield Court of Appeals.

Missouri.

April 27, 1966.

Claude T. Wood, Richland, for defendants-appellants.

J. W. Grossenheider, Lebanon, for plaintiff-respondent.

RUARK, Judge.

This is a class action brought under a resolution of the Board of Aldermen of the City of Lebanon in accordance with the Sawyer Act (V.A.M.S., Sec. 71.015, Laws of 1953, p. 309). The trial court found the proposed annexation reasonable and necessary and authorized the submission of the proposition. Defendants have appealed.

Lebanon is a city of the third class, and the evidence indicates that it has been growing since its last annexation in 1952 when its official (1950) census was 6,808. The 1960 census was 8,220. The mayor testified that its present population is approximately ten thousand, but we are not sure whether or not this figure includes the outlying areas, particularly those involved in this case. The mayor's testimony was that the city area is six and one-half square miles. However, the able and experienced trial judge found the actual area of the city to be approximately twenty-five hundred acres (or in the neighborhood of 3.8 square miles). This substantially accords with our computation made from the various exhibits.[1]

The proposed annexation is somewhat ambitious as to area. There are two areas sought to be annexed, and they are totally disconnected. One consists of three hundred twenty acres on the extreme north of the city, and the other consists of eighteen hundred acres on the extreme south, making a total combined acreage of two thousand one hundred twenty, or approximately 3.3 square miles. Thus, the city is seeking in one move to almost double its size.

The proposed area on the south (the eighteen hundred acres) is somewhat difficult to describe. It commences at the present city limits and extends south a distance of at least two miles. It is one and three-quarters miles wide in its widest portion. Then, in various stages, it cuts back to shrink its eastern boundary so that, at its extreme south end, it is slightly in excess of one and one-quarter miles wide. What is called "Old 66" (city route) is located in the westerly portion of the bulging rectangle on the south. Old 66 extends from Interstate 44 (to be later mentioned) north into the city. The west line of the south area is one-quarter mile west of this highway. Located in the easterly portion of this rectangle is State Highway 5. The east line of the proposed area extends from one-half mile east of this highway to, as it gradually shrinks on the south, approximately three hundred feet east. Old 66 and Highway 5 are a mile apart. Interstate 44, a divided, four-lane, limited access highway, enters the

---

1. As nearly as we can compute it, the exact acreage is 2,460.

rectangle at the southwest corner. It encounters Old 66 at a point about three-fourths mile north of that southwest corner and effectively blocks Old 66 from the area to the south, but there is an interchange which permits an overhead passage from Interstate 44 to Old 66 and thence northward into the city. Then Interstate 44 extends northeasterly to a point where it leaves the rectangle at approximately the northeast corner of the annexed area but within the present city limits. There is an overpass or interchange which permits transfer onto Highway 5 north into the city or south into the southeast area of the eighteen hundred acre tract. There appear to be no other roads or streets, overpasses or underpasses, on Interstate 44 in this area. Thus the area southeast of Interstate 44 is substantially isolated from the area northwest and from the city itself except for the interchange and overpass at the northeast corner.

There seems to be no question that the area immediately adjoining Old 66 north of Interstate 44 and leading into the city has taken on urban characteristics. Along and next to the highway it is built up with motels, filling stations, and similar businesses, largely those which cater to the traveling public; and there appear to be at least two small subdivisions extending outward from Old 66. There is at least one small subdivision immediately adjoining the city on the north, and over east on Highway 5 there has been some building or development in the north portion (south of the overpass). But as the road proceeds south the development becomes less and virtually nil. About the only development in or near the extreme south portion of the rectangle is a tract of approximately two hundred acres which is said to be the city airport. The main portion of the area, both that lying west of Old 66 and east of Highway 5 and that within the mile between the two, is virtually undeveloped and unused for anything except agricultural purposes. Some of it is in brush. The three-hundred-twenty acre area on the north has residences along the high-way leading north, and there appear to be some country homes within the area. Also, in the extreme northeast corner there is a subdivision which has some eighteen houses. The balance of the area, both the north three hundred twenty acres and the south eighteen hundred acres, excepting the development along the highways, is as stated largely devoted to agricultural uses. The witnesses give the percentage of the whole of the to-be-annexed areas devoted to this purpose as eighty to eighty-five per cent. A greater portion of the land is devoted to cattle grazing, although there is mention of a dairy farm, a hog farm, grape vineyard, cornfields, hayfields, a farm in the soil bank, and possibly some other uses. There is no evidence concerning the value of the lands or their adaptability for city purposes except as may be inferred from the development on the highways, particularly along Old 66.

The appellants have made several contentions. We think we need consider only the first one, which is double-barreled in that it submits that the petition fails to plead and (also) the proof wholly fails to support or authorize a class action in regard to selection and adequacy of the representation of the owners.

■ Sec. 507.070, RSMo 1959, provides for the appointment of such representatives of class as will "fairly insure adequate representation of all." Civil Rule 52.09(a), V. A.M.R., provides, "Whenever an action is instituted * * * against one or more defendants as representative or representatives of a class, the petition shall allege such facts as shall show that they or the defendants specifically named and served with process *have been fairly chosen and adequately and fairly represent the whole class. The plaintiff shall be required to prove such allegations,* unless all of the members of the class have entered their appearance * * *."

The provisions of the above are mandatory, and the courts have usually been diligent in seeing that the rights of those not

served are protected by the actual compliance with the requirements of the rule.[2]

As to the pleading: Plaintiff's allegations in this respect are as follows: "That it is impractical to bring all of the property owners [e]ffected by this suit before this court and the above named defendants will fairly insure adequate representation of all, and the character of the right sought to be enforced against the class is several and the object of the action is the annexation of real estate owned by the class by the plaintiff herein and that said defendants have been fairly chosen and adequately and fairly represent the whole class of said property owners."

■ The appellants filed a general motion to dismiss for failure to state a claim but did not specifically raise this question and did not attack this feature of plaintiff's petition until after judgment (although they did plead an insufficient number of representatives in their answer). Apparently they filed a motion for bill of particulars at the same time they filed the motion (this motion was not aimed at the questions here involved). The inclination of the courts is to give the pleadings every reasonable intendment in support of a sufficiency when the question is presented on appeal. This in order to prevent entrapment. Welker v. Pankey, Mo.App., 225 S.W.2d 505(1); Copher v. Barbee, Mo.App., 361 S.W.2d 137, 145; and cases at West's Missouri Digest, Pleadings, ☜34(7).

■ The allegations in the petition are substantially in the language of Rule 52.09. The words of the statute are generally sufficient if such language reasonably informs the defendants of what they are to meet.[3]

The rule does not require the plaintiff to state *how* the class representatives were chosen or *how* they will "adequately represent." It is sufficient if the plaintiff pleads the ultimate essential facts of his cause of action, not the evidence by which those ultimate facts will be established. Fish v. Fish, Mo.App., 307 S.W.2d 46, and cases cited at 51; Wonneman v. Wonneman, Mo. App., 305 S.W.2d 71(1); Jones v. F. W. Woolworth Co., 234 Mo.App. 1189, 122 S.W.2d 41. We believe the allegations can be taken as a pleading of ultimate facts.

But as to the second phase of the contention we are of a different opinion. We can find absolutely no proof as to how the purported representatives of the class were chosen. As to this, in the language of Blair, J., in Hribernik v. Reorganized School District R–3, Mo.App., 276 S.W.2d 596, 599: "How they were chosen, if indeed they were chosen, or why they might adequately and fairly represent the class is left for us to ponder." (See also Milton Const. & S. Co. v. Metropolitan St. Louis S. Dist., supra, Mo.App., 308 S.W.2d 769, 773). Nor can we *infer* that the rule and statute were complied with. There were two hundred sixteen tracts involving three hundred thirteen owners. There were twelve defendants, but these were composed of six couples, presumably husbands and wives. Two couples, or four people, did not answer or participate in the trial. We know nothing about them. None of the wives of the remaining four couples participated in the trial or testified as witnesses. As to the four remaining men: One Joe Esther, although his name (together with his wife's) appears in the caption as defendant, does not otherwise appear in the case as witness or in any other capacity. We know nothing about him;

2. Kansas City Terminal Railway Co. v. Industrial Comm., Mo., 396 S.W.2d 678, 680; Hribernik v. Reorganized School Dist. R–3, Mo.App., 276 S.W.2d 596, 599; Sheets v. Thomann, Mo.App., 336 S.W. 2d 701; Milton Const. & S. Co. v. Metropolitan St. Louis S. Dist., Mo.App., 308 S.W.2d 769, 772 et seq.; Bellerive Country Club v. McVey, 365 Mo. 477, 284

S.W.2d 492(14); Campbell v. Webb, 363 Mo. 1192, 258 S.W.2d 595.

3. 71 C.J.S. Pleading § 86(c), pp. 204–205; Stock v. Schloman, 226 Mo.App. 234, 42 S.W.2d 61(4); Peak v. Judd, Mo.App., 278 S.W. 1044; see Dietrich v. Dietrich, Mo.App., 209 S.W.2d 540.

and, in fact, it is difficult to determine whether or not he actually lives within the annexed area. Apparently he has *some* property or portion of his property within the present city limits. The three remaining men who appear as defendants and testify are as follows: Dr. Hughes is a veterinarian. He and his wife live within the present city limits but own an interest in a small animal hospital on property consisting of about two acres with a two hundred ten foot frontage on Highway 5, in what we refer to as the southeast portion of the eighteen-hundred-acre tract below Interstate 44. Elmer Holman is a retired undertaker. He and his wife own and live on a forty-acre tract near Old 66 and northwest of Interstate 44 within the annexed area. We are unable to determine to what purpose this forty is devoted. He testified as a witness. The remaining representative is John R. Klug. He conducts an automobile supply business within the city, but he and his wife live in the north area, where he owns ninety-three acres. Three acres are within the present city limits, and ninety are within the area proposed to be annexed. He runs fifty head of cattle on this land. And, so far as the record shows, he is the only man interested, even as a sideline, in an agricultural pursuit, although, as we have said, the evidence is that eighty to eighty-five per cent of the land to be annexed is so devoted. As we have stated, the north area is separated from the south area by the length of the city. Again Interstate 44 effectively separates the south area into two distinct portions. All three of these areas have different conditions and different interests and problems requiring some intimate knowledge on the part of the class representative for that area. To illustrate, a filling station operator has little in common with a dairy farmer. Various considerations govern the selection of persons to represent a class. These, of course, may vary according to the conditions of each case. While we do not find it frequently mentioned (see Crawford, Class Actions under the Missouri Code, 18 U. of K.C.Law Review, pp. 103, 107), we think one necessary consideration is financial ability. As most lawyers know, this type of action is expensive. Very often it involves (as it does here) surveys and a large number of exhibits, maps, and pictures. It is unfair to place the financial burden of maintaining or defending an action on one, two, or three people who must carry the load for over three hundred others. There is no evidence which gives a very good indication of the financial ability of these three active defendants other than the fact that each owns some property or an interest therein. Certainly the larger the number of representatives, the more the burden is spread. We bear in mind that the basic purpose is to see that the rights of the absent, and perhaps even unknowing, owners are protected.

■ We agree with most of the pronouncements made in City of St. Ann v. Buschard, Mo.App., 299 S.W.2d 546, although we are doubtful as to the naming of one person as a group representative. But the evidence in that case (so much as is shown) is far different from ours. There the members of the class were of a substantially compact residential area with no industry. In our case the interests and uses of the people whose rights are affected cover a wide range, and the separate areas involved require different knowledge and different treatment. Since there was not the proof required by the rule as to how the class representatives were chosen (compare City of St. Ann v. Buschard, Mo.App., 356 S.W.2d 567) or that they fairly represented the membership of the class, and since we cannot assume and infer what it was plaintiff's duty to prove, we feel that we must therefore reverse.

This should end this case. But the members of this court agree that a similar suit is likely to reach this court, and we do not wish our silence as to other matters to be taken as an implied approval of all other questions which have been raised by the appellants.

The evidence of neither party makes it very clear as to how much unused space is

available in the City of Lebanon.[4] It is true that the city offered the rather general opinions of certain witnesses that there is not much space available for future planning and growth. On the other hand, defendants have evidence of various empty spaces, supported by aerial pictures, and there is evidence that a portion of the area within the present city limits is being used for cattle grazing; although we do not mean to imply that it is challenging the King Ranch of Texas. But the evidence of both parties is unsatisfactory in that it fails to give a very good idea of what portion or percentage or total usable acreage within the present city limits is unused.

Also we have some doubt as to whether certain portions of the area, particularly that which lies southeast of Interstate 44 (except that in the vicinity of the interchange on Highway 5), have acquired any of the characteristics of city property, whether they have any value because of nearness or suitability for urban use, and whether the annexation of that entire southeast area is either necessary or reasonable. We think it extremely unlikely that the city will extend its streets down through the north portion of the south tract and across Interstate 44 into the southeast area. At least not under present or reasonably foreseeable conditions.

The judgment is reversed.

STONE, P. J., and HOGAN, J., concur.

4. See City of Aurora v. Empire District Electric Co., Mo.App., 354 S.W.2d 45; City of Houston v. Duff, Mo.App., 338 S.W.2d 373.