**ART GAINES BASEBALL CAMP, INC., a corporation, Plaintiff-Appellant,**

v.

**Clair HOUSTON et al., Defendants-Respondents.**

**No. 34693.**

Missouri Court of Appeals, St. Louis District.

Oct. 9, 1973.

---

Fortus & Anderson, Clayton, for plaintiff-appellant.

J. Robert Tull, Raymond C. Lewis, Jr., Columbia, for defendants-respondents.

DOWD, Chief Judge.

Action to restrain defendants from enforcing an amendment to the constitution of defendant Missouri State High School Activities Association (M.S.H.S.A.A.) and for damages. The rule in question, Amendment No. 16, under Standards of Eligibility, Sec. 4–L, provides in effect that a secondary school student who attends a camp specializing in one sport for more than two weeks during the summer shall lose his eligibility the following year to represent his school in that particular sport. The rule also authorizes schools to conduct their own camps for up to two weeks. However, a student is not permitted to participate in both a school camp for two weeks and in a non-school camp for another two weeks when both camps specialize in the same sport. The rule does not prohibit attendance all summer in a generalized camp where several sports are taught nor does it prevent a boy from spending two weeks in each of several camps which specialize in different sports. Judgment was for the defendants and plaintiff has appealed.

The M.S.H.S.A.A. is a voluntary, unincorporated association of schools formed in 1926 for the purpose of setting standards for the regulation and supervision of interscholastic activities in Missouri high schools. The activities originally centered on athletics but at the present time also include speech, debate, and music. All of the senior high schools and 80% of the junior high schools in Missouri are members of the Association, for a total of approximately 800 member schools. About 90% of these are public schools, the rest being parochial schools, private schools, and state educational institutions. The Association is neither an agency of the State government nor mentioned in Missouri statutes but is recognized by and works with the Missouri State Department of Education.

The members of the M.S.H.S.A.A. are schools which are controlled by their respective boards of education. An eight-member Board of Control administers the Association's programs. The Association is governed by a constitution and by-laws, with amendments to the constitution requiring a two-thirds vote of the member schools voting.

Every state has an organization similar to the M.S.H.S.A.A. and only a few are incorporated. All fifty of the state associations belong to a National Federation of State High School Associations which performs advisory and service functions.

In 1956 the National Federation recommended that member associations adopt a rule making a student ineligible if he participated for any length of time in a football or basketball camp. Such a proposal failed to obtain the necessary two-thirds vote in Missouri in 1957 and again in 1960.

In March 1969, Mr. Irvin Keller, the Association's Executive Secretary, sent out a questionnaire to elicit reaction from member schools to proposed amendments concerning specialized summer camps. The rule now in controversy was not on this questionnaire but was drawn up by the Executive Secretary and submitted to the Board of Control for approval in September, 1969. The National Federation recommended the two-week rule to the state associations. The rule was approved by the members of the M.S.H.S.A.A. and became effective July 1, 1970.

Plaintiff Baseball Camp consists of 320 acres in Shelby County, Missouri and represents an investment of about $225,000. The camp is open to boys from nine to twenty-two with the heaviest concentration in the 14–17 age bracket. The camp teaches baseball fundamentals in a non-competitive manner. Plaintiff claims the camp has been geared consistently for three-week sessions, but a boy could attend for a one-week session or could remain as long as ten weeks. About two-thirds of the campers come from states other than Missouri and, therefore, are not affected by the Missouri rule. Previous to 1970, over fifty percent of Missouri campers had stayed for at least three weeks.

During the period from 1965–1970, the total number of campers attending for one or two weeks had increased and surpassed the number attending for three weeks, as indicated by the following table (which does *not*, however, include a small number of boys who stayed more than three weeks):

| Year | One and Two Weeks | Three Weeks |
|------|-------------------|-------------|
| 1965 | 78  | 133 |
| 1966 | 63  | 139 |
| 1967 | 121 | 121 |
| 1968 | 122 | 166 |
| 1969 | 167 | 106 |
| 1970 | 157 | 123 |

Plaintiff admitted that the rates had been increased in each of these years and acknowledged that there had been an increase in baseball camps.

In 1970 plaintiff's camp experienced forty-six reductions or cancellations, twenty-two of which were from Missouri. Five of the twenty-two Missouri boys cancelled because of illness or school conflict. Plaintiff at trial contended that in 1970 two boys cancelled three-week contracts because of the Association rule and two other boys reduced their stay by one week. It was alleged that in 1971 three boys cancelled three-week contracts, one boy cancelled a five-week contract, and two boys reduced by one week because of the Association rule. These cancellations and reductions would represent a loss of gross income for plaintiff of $470 in 1970 and of $1,345 in 1971.

Defendants contend on appeal that losses from 1971 must be discounted because the trial court had issued a restraining order and temporary injunction on July 1, 1971. At trial, however, there was testimony that some boys believed, usually because of statements by their high school coaches, that *any* attendance at the plaintiff's camp could jeopardize their eligibility since

plaintiff's camp had not been put on the Association's approved list. Mr. Keller confirmed this belief at trial. [To be approved, a specialized camp must agree to limit attendance by a boy to two weeks. The plaintiff did not return the application for approval to the Association.] At least one boy cancelled a two-week session in 1971 because of fear his eligibility might be jeopardized by attendance at a non-approved camp.

Plaintiff's primary contention on this appeal is that the above cited rule was unreasonable and that plaintiff was damaged thereby. Testimony to support this contention was given by high school coaches, instructors at plaintiff's camp (including guest instructor and ex-Cardinal player Terry Moore), sports writers, parents of campers, and past and present campers. Reasons adduced to show that the rule was unreasonable may be summarized as follows:

1) attendance at a specialized camp for three weeks rather than two would not hurt or "burn out" a boy;

2) attendance at a camp may be the only chance for a boy, who had not made a team, to improve his skills;

3) attendance at such a camp teaches fundamentals and does not involve the highly competitive atmosphere found in school varsity teams and various summer leagues;

4) the more time a boy spends in camp, the less chance he has to get into trouble during the summer;

5) the Association has no authority to tell parents and students what they can do during a vacation period;

6) music camps are not covered by the two-week rule and there is no reason why athletics should be limited while music is not;

7) attendance at a specialized camp did not lead to conflicts over the theories taught at camp and by school coaches.

Evidence as to the reasonableness of the rule was given by athletic directors, school superintendents and principals, officials of the State Department of Education, and officers of the Association and of the National Federation. This evidence may be summarized as follows:

1) the rule helped prevent inequalities and unfair advantages between students with different economic means, as well as between schools located in areas of differing economic wealth;

2) the rule helped prevent conflicts between campers and their coaches over theory;

3) the rule was necessary to prevent young students from being "burned out" in a sport;

4) the rule promoted development of the whole child by preventing premature specialization and by exposing students to sports in which they could participate throughout life;

5) the rule helped prevent overprofessionalism, exploitation, and undue pressure on students from parents, coaches, and booster clubs;

6) the two-week period represented a balance between no camp at all and the alleged abuses of prolonged camp;

7) the recommendation by the National Federation and the adoption by the Missouri member schools indicated the reasonableness of the rule.

The Association contended that the different rules for music camps could be justified by the different types of competition involved and by the fact there had been no complaints of abuses concerning the music camps. Defendants stated that the rule was not aimed at any particular camp, and that only the plaintiff, out of 319 camps doing business in Missouri in 1971, had complained about the rule.

Plaintiff asserts on this appeal that, since the trial court merely stated that it

found for defendants without setting out the grounds for its decision, the trial court necessarily ruled against plaintiff on every issue of the cause of action submitted. We agree that all claims upon which relief could be granted contained in plaintiff's petition were decided in favor of defendants. We are not, however, bound by plaintiff's statement on this appeal of what those claims were. Our analysis of plaintiff's first amended petition indicates three claims for relief. Plaintiff seeks (1) injunctive relief based on the assertion that the amendment is arbitrary, unreasonable and unlawful; (2) monetary relief based on the assertion that the actions of defendants were in violation of the Missouri Restraint of Trade Statutes; and (3) monetary relief based on the assertion that defendants' actions constituted a wrongful interference with contracts between plaintiff and third parties. Plaintiff's contentions on this appeal with respect to those three claims must be answered. In addition, plaintiff's contention that the trial court found that the defendant association was not properly sued must be dealt with. Plaintiff raises other points on this appeal which are not relevant or necessary to the determination of this appeal and therefore need not be discussed.

■ Plaintiff contends that the trial court erred in finding that the defendant association was not properly sued. Plaintiff asserts that, even though the M.S.H.S.A.A. is a voluntary association, it may be sued as an entity. We need not discuss this for we feel plaintiff's alternate assertion, that this is a proper class action, is correct and establishes the trial court's jurisdiction.

We are convinced that plaintiff's action comes within the purview and intent of the standards for a class action as established by statute [1], Supreme Court Rule [2], and case law.[3] The membership of M.S.H.S. A.A. which is approximately 800 schools clearly constitutes a class "so numerous that joinder of all members is impracticable." The questions plaintiff seeks to have litigated are common to the entire class in that the rule was enacted by vote of the members and governs all the members. And who is more able to insure fair and adequate adjudication of the interests of all the members of the class than the Executive Secretary who is the executive officer of the Association and the members of the Board of Control who interpret and enforce the Constitution and By-Laws of the Association? Finally, it is apparent that any injunction, to be at all effective, must be directed to the class as a whole since any change in the rule must be effectuated by a vote of the members.[4]

Defendant asserts that this is not a proper class action because: (1) plaintiff has failed to allege and prove the necessary elements of a class action [i. e., fair and adequate representation]; and (2) plaintiff must name a member of the class as a defendant to insure this representation and the members here are schools. Plaintiff's petition stated that this is a class action and that the named individuals, being past and present members of the Board of Control, were "representatives of the class consisting of the members of the defendant Association." Referring to the Constitution of the M.S.H.S.A.A., Article IV states:

"Section 1. The administrative body of this Association shall be a Board of Control of eight members representing the eight districts of the state. The members of the Board of Control shall be active school superintendents or principals of member schools in good standing in their respective districts who meet the standards set by the State Depart-

---

1. Section 507.070, RSMo 1969, V.A.M.S.

2. Rules 52.08 and 52.09, V.A.M.R., 1972 [current rule 52.08, 1973].

3. *See*, Sheets v. Thomann, 336 S.W.2d 701 (Mo.App.1960); Campbell v. Webb, 363 Mo. 1192, 258 S.W.2d 595 (1953).

4. Footnote 2, supra.

ment of Education for principals or superintendents.

\* \* \* \* \* \*

"Section 3. Election of members of the Board of Control:

a. Candidates shall be nominated by primary ballot provided by the Secretary to each member school of the Association in the district where the vacancy occurs.

b. The names of the three persons having the highest number of votes in the primary election shall appear on the final ballot. \* \* \* The person receiving the highest number of votes on the final ballot shall be declared elected to the Board of Control.

c. Each member school shall have one vote."

We are convinced that plaintiff has met his burden of pleading and proving that the named individuals would provide fair and adequate representation of all members of the class. The petition states that the named individuals are agents of the Association, its governing body and the members of the Association. The above quoted language from the Association's Constitution fortifies the allegation of the petition that the named individuals are representatives of the class consisting of the member schools. The election procedure assures the voice of each member in the selection of the person who is to represent that member. It is apparent that fair and adequate representation is achieved by naming as defendants the members of the Board of Control in that they are the chosen representatives of the members and the process of selection is just and equitable.

■ Plaintiff's next assertion is that the rule limiting summer camps to two weeks

is unreasonable and arbitrary. Neither party has cited nor has our research uncovered a case in which a Missouri court has ruled on a similar contention. Representative of cases from other jurisdictions which deal with similar problems[5] however, is the case of Brown v. Wells, 288 Minn. 468, 181 N.W.2d 708 (1970). The Minnesota Supreme Court, in determining the reasonableness of a rule governing eligibility of a high school student to participate in specified athletic activity, stated:

"In the final analysis, the court must determine if the board's action is so willful and unreasoning, without consideration of the facts and circumstances, and in such disregard of them as to be arbitrary and capricious. Where there is room for two opinions on the matter, such action is not 'arbitrary and capricious,' even though it may be believed that an erroneous conclusion has been reached. \* \* \* "
181 N.W.2d at 710.

Along with entrusting the education of our children to teachers and administrators, we also entrust the control and supervision of the extracurricular activities incident to that education. Implicit in the responsibility for these activities is the power to make reasonable rules and regulations. We are dealing here with numerous schools who have voluntarily joined an association. As members of this association, they may, by majority vote, enact rules to govern their interaction.[6] It is obvious that chaos would result without such rules. It is also obvious that the members are in the most advantageous position to appreciate the regulations under which they must act to achieve desired goals. A court should not interfere with the enactment of those regulations as long as they are rea-

5. Tennessee Secondary School Athletic Association v. Cox, 221 Tenn. 164, 425 S.W.2d 597 (1968); Scott v. Kilpatrick, 286 Ala. 129, 237 So.2d 652 (1970); Morrison v. Roberts, 183 Okl. 359, 82 P.2d 1023 (1938); Marino v. Waters, 220 So.2d 802 (La.Ct.App. 1969); Robinson v. Illinois High School Association, 45 Ill.App.2d 277, 195 N.E.2d 38 (1963). These cases generally upheld the reasonableness of rules enacted by voluntary associations to regulate athletic activities.

6. The rule in question was enacted by a 375 to 130 vote.

sonable and do not infringe on public policy or law.[7]

Clearly this rule does not infringe on public policy or law. Nor do we believe it to be unreasonable or arbitrary. To be unreasonable and arbitrary, this rule would have to be without a rational ground or justification. This is not the case here. Undoubtedly, this rule will engender strong and diverse feelings. However, this does not constitute unreasonableness or arbitrariness. The volume and competence of the testimony as to the need for and desirability of this rule show that a rational basis for the rule does exist and that its enactment by the members was justified. We cannot say that this rule is unreasonable and therefore we should not substitute our judgment for that of the Association. We reject plaintiff's assertion.

■ Plaintiff next alleges that the "trial court erred in finding that defendants did not wrongfully interfere with contracts between plaintiff and third parties." In support of this allegation, plaintiff cites the leading case of Downey v. United Weather Proofing, 363 Mo. 852, 253 S.W.2d 976 (1953). The court stated at page 980:

"It has now come to be the view of a majority of courts in this country that one who maliciously or without justifiable cause induces a person to breach his contract with another may be held responsible to the latter for the damages resulting from such breach. The term 'maliciously' in this connection alludes to malice in its technical legal sense, that is, the intentional doing of a harmful act without justification or excuse, and does not necessarily include actual malice, that is, malice in the sense of spite or ill will.

"The right to perform a contract and to reap the profits therefrom, and the right to performance by the other party, are property rights entitling each party to the fulfillment of the contract by performance. And the intentional interference with the contractual relation without just cause so as to effect a breach of the contract is a wrong for which the wrongdoer may be held accountable in damages. * * *"

This language fails to support plaintiff's premise. We have stated above that there is sufficient evidence to show justification for the enactment of the rule. In addition, the record is devoid of evidence of an *intentional interference* with contractual relations or *malicious inducement* to breach a contract. We therefore reject the assertion that the defendants are liable for wrongful interference with contracts.

Finally, we have the plaintiff's assertion that the trial court erred in finding that the defendants were not in violation of the Missouri statutes on restraint of trade. This argument is based, as was the preceding one, on plaintiff's contention of unreasonableness and arbitrariness. Based on the discussion above, it is apparent that the rule is reasonable and the defendants' actions do not constitute a restraint of trade. Adams Dairy, Inc. v. Burke, 293 S.W.2d 281 (Mo.1956).

Judgment affirmed.

WEIER and McMILLIAN, JJ., concur.

---

7. *See* State ex rel. National Junior College Athletic Association v. Luten, 492 S.W.2d 404 (Mo. App.1973).