Julie Anne BARNHORST, By Her Parent and Legal Guardian, Marcella Barnhorst

v.

MISSOURI STATE HIGH SCHOOL AC-TIVITIES ASSOCIATION, Sunset Hill School and H. John Stander, Headmaster of Sunset Hill School.

No. 80–1036–CV–W–3.

United States District Court,
W. D. Missouri, W. D.

Dec. 16, 1980.

Thomas F. Sullivan, McDonald & Dykes, Overland Park, Kan., for plaintiff.

J. Robert Tull, Tull & Mayse, Columbia, Mo., for defendant MSHSAA.

W. M. Stapleton, Lathrop, Koontz, Righter, Clagett, Parker & Norquist, Kansas City, Mo., for defendants School and Stander.

## MEMORANDUM AND ORDER

RUSSELL G. CLARK, District Judge.

On November 25, 1980, plaintiff Julie Anne Barnhorst instituted this action, by and through her next friend and parent Marcella Barnhorst, to obtain injunctive relief against the defendants, Missouri State High School Activities Association ("MSHSAA"), Sunset Hill School ("Sunset") and H. John Stander, in his capacity as headmaster of Sunset. Plaintiff has invoked this Court's jurisdiction under 28 U.S.C. § 1343 (1976), which confers jurisdiction upon federal district courts over civil actions which are brought "[t]o redress the deprivation, under color of any state law, statute, ordinance, regulation, custom or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States." 28 U.S.C. § 1343(a)(3). Plaintiff challenges a rule found in MSHSAA's constitution which, with few exceptions, forbids any student, who transfers from one member school of MSHSAA to another member school, to participate in interscholastic athletic competition for a period of 365 days from the date of the transfer. She contends that the rule violates her right to equal protection of the laws under the Fourteenth Amendment of the United States Constitution, and that it is unreasonable, arbitrary and capricious, an attack which is apparently premised on either the constitutional demands of the Due Process Clause of the Fourteenth Amendment *or* on Missouri law governing quasi-judicial actions of a voluntary association, or both.

On the date the complaint was filed, plaintiff moved for and this Court issued a temporary restraining order, pursuant to Fed.R.Civ.P. 65(b), which forbade defendants to enforce the transfer rule and suspended the effectiveness of the suspension and forfeiture provisions of MSHSAA's constitution until the conclusion of a hearing on a preliminary injunction, which was scheduled for December 2, 1980. All parties appeared at that hearing and were provided with the opportunity to present evidence and argument bearing on plaintiff's request for injunctive relief. Defendant MSHSAA then moved for dismissal of plaintiff's complaint on the bases that this Court lacked subject matter jurisdiction; that the complaint failed to state a claim upon which relief could be granted; and that MSHSAA was not properly served with process. At the close of that hearing, the Court announced that it would extend the temporary restraining order for an additional ten days, to and including December 12, 1980, during which time the parties would be permitted to file supplemental briefs. By stipulation of the parties, the effectiveness of the restraining order was extended through December 16, 1980. The Court has received and reviewed the supplemental briefs in conjunction with its examination of the parties' prior pleadings and their presentations at the hearing, and has concluded that a preliminary injunction should not issue and that MSHSAA's motion to dismiss should be denied. The findings of fact and conclusions of law which are set forth in this memorandum order are made only for the purpose of determining whether plaintiff should prevail on her request for a preliminary injunction; any party to this action is free to conduct additional discovery and subsequently request a hearing on the merits.

## I. FINDINGS OF FACT

1. Plaintiff Julie Anne Barnhorst is a minor (sixteen years of age) who resides with her parents in Kansas City, Missouri.

2. Defendant MSHSAA is a voluntary, nonincorporated association of private and public junior and senior high schools, and is a resident of Missouri.

3. Defendant Sunset is a private high school located in Kansas City, Missouri, and is a member of MSHSAA. Sunset's student population consists of girls only and numbers approximately 180. Sunset is located about five blocks from plaintiff's residence (Testimony of Marcella Barnhorst).

4. Defendant H. John Stander is the headmaster of Sunset, and is responsible for its enforcement of and compliance with the constitution and bylaws of MSHSAA (MSHSAA Constitution, Article XII, § 2 [Exhibit A to plaintiff's complaint]).

5. During the ninth grade of her education (the school year 1979–80), plaintiff attended Notre Dame De Sion ("Notre Dame"), a private high school located in Kansas City, Missouri. The curriculum at Notre Dame spans grades 9–12. Notre Dame is a member of MSHSAA. Notre Dame is located approximately seven to eight miles from plaintiff's residence (Testimony of Marcella Barnhorst).

6. Both Notre Dame and Sunset field various athletic teams which compete with teams of other member schools of MSHSAA; member schools are prohibited from competition with schools which are not MSHSAA members. While at Notre Dame, plaintiff participated in interscholastic athletic competition in three sports—volleyball, basketball and track, in addition to occupying the position of class president and attaining an outstanding level of academic achievement (Testimony of Karen Boulware, Marcella Barnhorst & Julie Anne Barnhorst).

7. Plaintiff's decision to transfer from Notre Dame to Sunset was made after consultation with her parents, and was based on their beliefs that Sunset would offer plaintiff a superior academic program and that plaintiff's prospects of attending outstanding universities or colleges would be enhanced by her enrollment at Sunset. Participation in interscholastic athletics at Sunset was not an impetus to the transfer decision, nor did it play any part in that decision. Neither plaintiff, nor her parents,

were ever "recruited", solicited, or influenced by any official, teacher, or other person affiliated with Sunset in connection with the decision to transfer to Sunset. The decision was made sometime in June, 1980, and plaintiff and her parents learned sometime in August, 1980, that Sunset had accepted her application for enrollment (Testimony of Julie Anne Barnhorst, Marcella Barnhorst & Karen Boulware).

8. At the time the transfer decision was made, plaintiff and her parents were aware that Sunset was a member of MSHSAA and that one of MSHSAA's rules generally prohibits a transfer student from participating in interscholastic athletic competition for a period of 365 days from the time of the transfer. They believed, however, that the circumstances of plaintiff's transfer decision would fall under an exception to the general rule. Subsequent to plaintiff's enrollment at Sunset, she inquired into the possibility of joining Sunset's volleyball, basketball and track teams; she and her family then learned from Karen Boulware, athletic director at Sunset, that plaintiff would not be eligible to compete in interscholastic athletics until the following school year, 1981–82, as a result of MSHSAA's transfer rule (Testimony of Marcella Barnhorst & Julie Anne Barnhorst).

9. After learning that she would be ineligible to compete on Sunset's athletic teams during the 1980–81 school year, plaintiff requested H. John Stander, headmaster of Sunset, to seek a determination of eligibility from Jack Miles, executive secretary of MSHSAA. Mr. Stander made such a request by letter on October 27, 1980; in a letter dated October 30, 1980, Mr. Miles issued his determination that no basis existed for granting plaintiff eligibility to compete during the 1980–81 school year. Subsequently, plaintiff and her parents appealed Miles' decision to the Board of Control of MSHSAA. After holding a hearing on November 5, 1980, at which plaintiff was permitted to appear and present her arguments in support of her request for a determination of eligibility, the Board issued its decision on November 10, 1980, denying plaintiff's request. Plaintiff thus exhausted all available administrative remedies under MSHSAA's constitution and bylaws (Testimony of Marcella Barnhorst, Julie Barnhorst & Jack Miles; MSHSAA Bylaws § 10.1; Exhibits C–F of plaintiff's complaint).

10. Plaintiff desired to compete on Sunset's volleyball team this past fall but was unable to do so by reason of her ineligibility. The volleyball season came to an end in November. Plaintiff also wishes to compete on both the basketball and track teams at Sunset, if she is permitted to do so. As a result of the temporary restraining order issued by this Court, she has been able to participate as a member of Sunset's basketball team in the games which were scheduled during the opening weeks of the basketball season in this month, December, 1980 (Testimony of Julie Anne Barnhorst).

11. MSHSAA is an *activities* association established by junior and senior high schools for the purpose of adopting uniform standards to regulate interscholastic activities and contests among member schools. Activities encompassed by MSHSAA are athletics, speech and debate, music, and cheerleading. Among various specific objectives of the Association are the desires "to prevent exploitation of high school youth and the programs of member schools by special interest groups" and "to ensure greater statewide consistency and quality." MSHSAA Constitution, Article II, § 3(f) & (i) (Testimony of Jack Miles; MSHSAA Constitution & Bylaws).

12. MSHSAA has approximately 575 senior high schools and 200 junior high schools in its membership. Of these schools, approximately 90% are public, while the remainder are private or parochial. Programs administered by the Association affect some 500,000 students in Missouri. Nearly all of the public senior high schools of Missouri are members of the Association, and approximately 80% of the public junior high schools are also members. The governing structure of the Association is essentially democratic in nature; member schools

collectively exercise legislative authority to adopt, amend or repeal constitutional provisions and bylaws; executive and administrative responsibilities concerning enforcement of MSHSAA policies and rules are entrusted to the executive secretary of the Association; and judicial authority is vested in an eight-member Board of Control "to interpret the rules and provisions of the Constitution and Bylaws of the Association and ... be the final judge as to whether a violation has occurred." MSHSAA Constitution, Article IV, § 6(g). The eight individuals on the Board represent eight geographical districts within the State of Missouri and are selected by schools within each of the districts; each of the individuals is either a principal or a superintendent of a public school in his or her respective district. Local school boards have input into the formulation and enforcement of MSHSAA policies and rules through the district representatives (Testimony and Affidavit of Jack Miles; MSHSAA Constitution).

13. MSHSAA also receives input from a liaison committee composed of representatives from the Missouri State Department of Education, the Missouri School Board Association and the Missouri Association of School Administrators. That committee periodically reviews MSHSAA policies and rules and makes recommendations for revisions. The Missouri State Department of Education has statutory authority to regulate interscholastic educational activities only during the normal, six-hour school day; however, it has been the custom of the Department to advise MSHSAA through the liaison committee as to interscholastic activities conducted during periods outside the six-hour day. Consequently, the Department and the State of Missouri have recognized MSHSAA as the official regulatory body in the area of interscholastic activities occurring outside the normal school day, for at least the last fourteen years. Moreover, approximately 75% of all contests and competitive activities of member schools of MSHSAA occur on property owned by the State or municipalities (Testimony and Affidavit of Jack Miles; testimony of Dr. Robert M. Taylor).

14. The transfer rule which renders plaintiff ineligible is found in Section 8 of Article VIII of MSHSAA's Constitution, and it provides: "Students who transfer for reasons *other than promotion* are ineligible for 365 days *unless* their cases meet the standards under the exceptions that follow...." (emphasis added). The opening sentence of Article VIII clearly indicates that this restriction is applicable only to athletic competition, not to competitive activities in the areas of speech, debate and music or to cheerleading: "Any student who represents a school in *interscholastic athletics* shall meet the standards contained in this section...." (emphasis added). This statement also manifests that the standards apply only to *competition*, not to participation in team practice sessions; thus, plaintiff may participate in practice sessions of Sunset athletic teams, notwithstanding her ineligibility to compete for a period of 365 days (Testimony of Jack Miles, MSHSAA Constitution Art. VIII, § 8).

15. The "promotion" exception to the transfer rule provides immediate eligibility to compete in interscholastic athletics to students who transfer from one school to another upon completion of the highest grade of a recognized curricular unit of education within a school district; i. e., promotion from the sixth (and highest) grade of an elementary school to the seventh (and lowest grade) of a junior high school, or promotion from the highest grade (eight or nine) of a junior high school to the lowest grade of a senior high school (nine or ten). The other exceptions to the transfer rule can be generally characterized as situations in which the student and his or her parents have not exercised a "choice" to transfer from one school to another—i. e., a change in the residence of the student's parents or guardian for acceptable reasons other than athletic considerations or the closing of a school to a particular group of students. Although the automatic ineligibility bar of the transfer rule does not apply in these exceptions, the rule's objective of deterring recruiting abuses is not sacrificed in such

cases because another general provision of the Association's constitution, which applies to all activities, forbids and penalizes both recruiting and school-jumping:

"A student shall not have transferred from one school to another *BECAUSE OF SOLICITATION OR INFLUENCE* of any one connected with the school or because of undue influence of any individual or group outside the school. In case of such transfer the student shall be ineligible for 365 days, and the school shall be penalized if the influence is exerted by anyone connected with the school."

MSHSAA Constitution Article VII, § 6 (emphasis in original). None of these exceptions were applicable to plaintiff's transfer decision. Rather, since Notre Dame (the transferor school) is outside of the public school district in which plaintiff resides and Sunset (the transferee school) is within the district of her residence, the rule specifically provides that she is ineligible for a period of 365 days: "a student would have to attend one 365 day period to become eligible if he or she attended a school not in the home district and transferred to a private or parochial school located in the home district." MSHSAA Constitution, Article VIII, § 8(a) (Testimony of Jack Miles; MSHSAA Constitution).

16. A general provision of the MSHSAA Constitution grants the Board of Control authority to grant a student eligibility to compete in *any* one of the interscholastic activities regulated by MSHSAA, notwithstanding the student's inability to meet the specific eligibility standards for that particular activity, in a case of "hardship": "The Board of Control is authorized to grant eligibility to a student in a case *that is beyond the control of a student or his (her) parents*, which in the opinion of the Board involves *undue hardship* or an emergency and *does not violate the intent of any of the standards of eligibility. Cases involving any voluntary choice on the part of the student or parents shall not be heard under this section.* MSHSAA Constitution, Article VII, § 10 (emphasis added). Plaintiff requested the Board to consider her case under this provision; the Board declined to grant eligibility on a "hardship" basis, because plaintiff and her parents had clearly exercised a choice and because their belief that plaintiff's inability to compete in interscholastic athletic activities at Sunset during this school year might impair her prospects for admission to a prestigious college or university was, in the Board's opinion, speculative (testimony of Jack Miles; MSHSAA Constitution).

17. The section of MSHSAA's Constitution setting forth the transfer rule also appears to set out a stated rationale for the rule:

"When an athlete transfers schools and immediately represents a new school he or she generally replaces a deserving athlete who was in attendance the previous year, and who also wants to play. The following standards are for the purpose of assuring fairness to all students."

MSHSAA Constitution, Article VIII, § 8. Both the present and a past executive secretary of MSHSAA have explained, however, that this "displacement" concern is not the main objective of the rule; rather, the rule is aimed at the evil of overzealous and exploitative, athletic recruiting practices which had occurred in the past. And this desire to prevent abusive recruiting practices is certainly encompassed by the phrase "fairness to all students." Indeed, such a rule—prohibiting a transferring athlete from immediate participation in athletic competition—was one of the primary motivating forces behind the formation of the Association in 1926, and MSHSAA's Constitution has always contained some version of a transfer rule. As originally adopted in 1926, the transfer rule provided for a one-year period of ineligibility. The period was reduced by a 1928 amendment to one semester and remained that way until 1963, when the one-year period was restored. Member schools determined that a one-year period was necessary because many athletes circumvented the deterrent objective of the rule by transferring to another school between semesters, immediately after completing a season of competition in their primary or only sport, a tactic which en-

abled them to immediately compete in the next season of that sport after an "off-season" period of ineligibility (Testimony of Jack Miles; Affidavits of Jack Miles & Irvin A. Keller).

18. The transfer rule has never been applied to the activities of speech and debate, music and cheerleading, because the membership of MSHSAA has never perceived any need for such a rule in those areas. Neither the present executive secretary of MSHSAA, nor his predecessor, were able to recall, from their own experience and a review of the Association's records, any reported incident of recruiting or "school-jumping" in the areas of non-athletic activities, while there are records of a considerable number of such incidents involving athletes. The apparent reason for the absence of recruiting abuses in non-athletic activities is the relatively lower level of community interest, and perhaps student interest, in these activities as compared to the interest in sports—i. e., sports coaches are more susceptible to community pressures to win. It is this absence of a need which led various advisory committees of MSHSAA to reject a proposal made by a past executive secretary to extend the transfer rule to non-athletic activities, as part of a move to make *all* eligibility standards of *all* activities uniform. A similar proposal in 1977 met with the same fate. Irvin A. Keller, predecessor of the current executive secretary, explained the unwillingness of the membership of MSHSAA to bring non-athletic activities within the reach of the transfer rule in this manner:

> "Rules are developed as need arises. Adopting a transfer rule for non-athletic activities when no need has been evidenced could be considered arbitrary and unreasonable."

Affidavit of Irvin A. Keller, § 9, at 3. (Testimony and Affidavit of Jack Miles; Affidavit of Irvin A. Keller).

19. Not only has no recruiting or "school-jumping" occurred in this case, but it is unlikely that plaintiff's participation on any of Sunset's athletic teams, if permitted, would displace any other student athlete who is interested in competing. Sunset's athletic program exists primarily to provide a total educational experience to its students. The school often has difficulty in fielding a complete team in certain sports, and interested students are rarely, if ever, "eliminated" from a team. Nevertheless, the possibility exists that a Sunset student athlete, though not eliminated from a team, might be "displaced", by a transfer student such as plaintiff, from actual competition in particular contests. On the whole, plaintiff's participation in competition at Sunset after her recent transfer would not contravene the spirit and objectives of the transfer rule. The membership of MSHSAA no doubt recognized that a number of transfers like plaintiff's, which are wholly proper in nature and consistent with MSHSAA policies, would, nevertheless, be encompassed by the transfer rule's ineligibility bar. As the present executive secretary, Jack Miles, explained, however, the general administrative rule is necessary, because an individualized review of each and every transfer would be administratively impractical, if not impossible. Under the present rule, only a limited number of specific exceptions—situations of choice or hardship—require the time of the executive secretary and his staff for review. A former version of the transfer rule, adopted in 1942 and repealed in 1951, provided for an individualized system of review under which a transfer student could secure eligibility to compete in athletic activities immediately after transfer by requesting the principals of the transferor and transferee school to sign a release certifying that the transfer was made for valid reasons not related to athletics. Member schools found the rule unworkable because it subjected principals to considerable administrative work and conflicting pressures from students, teachers, and the community.

20. Apart from the transfer rule, MSHSAA's Constitution sets forth various other eligibility standards for athletic activities, which are not applicable to non-athletic activities. These standards, like the transfer rule, were adopted to respond to needs perceived only in the area of athlet-

ics. Illustrative of these standards are the age restriction rule generally forbidding students, who have attained the age of nineteen years prior to the first day of July preceding the opening of the school year, from competing in athletic activities, and the requirement that all student athletes take and pass a physical examination and secure basic athletic insurance coverage before practicing or competing in athletic activities. MSHSAA Constitution, Article VIII, § 2; By-Laws § 1.7. The need for these rules in the area of athletics and in that area only is self-evident (Testimony of Jack Miles).

21. Under the Association's constitution, if a member school believes any of MSHSAA's constitutional provisions or by-laws should be revised or abrogated, it may initiate a petition process to bring the matter before the membership. A petition for an amendment must be signed by the administrative officers of at least ten percent (10%) of the member schools who participate in the activity (or activities) to which the amendment is directed. A duly signed petition is first presented to the executive secretary on or before a designated time of the year; he or she, in turn, submits the proposed amendment by mail to all member schools; and the member schools then cast ballots on the proposed amendment by mail. The proposal must receive a two-thirds majority vote to become effective (Testimony of Jack Miles; MSHSAA Constitution, Article VI).

22. Plaintiff is a student of gifted intelligence, who has compiled an outstanding record of academic achievement. While academic performance is a highly significant factor in the admission decisions of college and university admissions committees, those committees also give consideration to extra-curricular and community activities to determine if an applicant has a well-rounded personality and will likely succeed in an environment of higher education. Plaintiff's desire to participate in athletics at Sunset is motivated, in significant part, by her cognizance of the considerations of college and university admission committees as well as by her interest in and apprecia-

tion of certain sports and the friendship opportunities inherent in team sports. She is now a member of the staff of Sunset's school newspaper and a member of the Sunset's foreign exchange club (Testimony of Dr. Gerald Vandenberg, Alice Gangle & Julie Anne Barnhorst).

## II. CONCLUSIONS OF LAW

### 1. This Court Has Jurisdiction Over This Action Under 28 U.S.C. § 1343

As stated at the outset of this memorandum, plaintiff has invoked this Court's jurisdiction under 28 U.S.C. § 1343. That statute grants this Court jurisdiction over any claim for relief, injunctive or monetary, from actions which allegedly deprive a party of any right secured by the United States Constitution or federal law, when the action is taken under the authority of state law. Defendant MSHSAA has challenged this Court's jurisdiction, contending that its activities do not constitute state action and that plaintiff's complaint does not raise a substantial federal question. The Court finds both of these arguments to be without merit.

#### A. State Action

It is not disputed that MSHSAA is a *voluntary*, nonincorporated association of junior and senior high schools, both private and public, and that it is not an official arm or instrumentality of the State of Missouri. No statute, regulation or ordinance of the state provides for its existence. Although MSHSAA is thus essentially a private party, it has significant contacts and relationships with the *public* schools of the State of Missouri and the State itself, as noted above. *See* Findings of Fact (FF) 12–13. Nearly every public high school, junior or senior, is a member of the Association and a substantial majority of contests between and among members of the Association occur on "public" property, owned by a municipality or the State. The Missouri State Department of Education, along with two other state educational associations, has a 'voice' in the conduct of the association's

activities and the formulation of its policies through a liaison committee. Indeed, the State Department of Education, lacking any statutory authority to regulate or control extracurricular activities beyond the regular six-hour school day, relies upon the Association to provide a uniform system of regulation over such extracurricular activities. Thus, the State of Missouri, through custom and practice, has recognized MSHSAA as the official body for the regulation and control of interscholastic, extracurricular activities. *See* FF 12; *accord State ex rel. Missouri State High School Activities Ass'n v. Schoenlaub*, 507 S.W.2d 354, 355 (Mo. en banc 1974) ("The Association ... is recognized by and works with the Missouri State Department of Education."); *Art Gaines Baseball Camp, Inc. v. Houston*, 500 S.W.2d 735, 736 (Mo.App.1973) (same).

■ It is beyond cavil that education is a traditional function of the state, and "perhaps the most important function of state and local governments." *San Antonio School Dist. v. Rodriguez*, 411 U.S. 1, 29, 93 S.Ct. 1278, 1295, 36 L.Ed.2d 16, 41 (1973) (quoting *Brown v. Board of Education*, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954)). Extracurricular activities are an important component of an education in today's modern society. The close identification of the functions served by MSHSAA with the State's provision of education to all children of school age (not otherwise receiving a private or parochial education) is a sufficient nexus, *see Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351–53, 95 S.Ct. 449, 453–455, 42 L.Ed.2d 477, 484–85 (1974), to transmute the challenged rule of MSHSAA into "state action" subject to the constitutional strictures of the Fourteenth Amendment of the United States Constitution. Numerous courts have reached the same conclusion regarding MSHSAA's counterparts in other states. *See, e. g., Walsh v. Louisiana High School Athletic Ass'n*, 616 F.2d 152, 156 (5th Cir. 1980) (Louisiana); *Wright v. Arkansas Activities Ass'n*, 501 F.2d 25, 27 (8th Cir. 1974) (Arkansas); *Brenden v. Independent School Dist.*, *742*, 477 F.2d 1292, 1295 (8th Cir.

1973) (Minnesota State High School League); *Morris v. Michigan State Bd. of Education*, 472 F.2d 1207, 1209 (6th Cir. 1973) (Michigan High School Athletic Association); *Louisiana High School Athletic Ass'n v. St. Augustine High School*, 396 F.2d 224, 227–28 (5th Cir. 1968) (Louisiana); *Oklahoma High School Athletic Ass'n v. Bray*, 321 F.2d 269, 273 (10th Cir. 1963) (Oklahoma); *Gilpin v. Kansas State High School Activities Ass'n, Inc.*, 377 F.Supp. 1233, 1237 (D.Kan.1973) (Kansas); *Bucha v. Illinois High School Ass'n*, 351 F.Supp. 69, 73 (N.D.Ill.1972) (Illinois); *Reed v. Nebraska School Activities Ass'n*, 341 F.Supp. 258, 260–61 (D.Neb.1972).

### B. Substantial Federal Question

■ MSHSAA contends that plaintiff's complaint does not raise a substantial federal question to warrant the invocation of jurisdiction under 28 U.S.C. § 1343, because eligibility to compete in interscholastic athletics is not a right or privilege secured by the Constitution or laws of the United States. In support of this claim, MSHSAA cites several cases which state that "[p]articipation in interscholastic athletics is not a constitutionally protected civil right." *Albach v. Odle*, 531 F.2d 983, 984–85 (10th Cir. 1976); *see Mitchell v. Louisiana High School Athletic Ass'n*, 430 F.2d 1155, 1157 (5th Cir. 1970); *Oklahoma High School Athletic Ass'n v. Bray*, 321 F.2d at 273; *Dallam v. Cumberland Valley School Dist.*, 391 F.Supp. 358, 361–62 (M.D.Pa.1975). With all due respect, the Court believes that those courts and defendant MSHSAA have confused the merits and appropriate standard of scrutiny of a claim under the Equal Protection Clause of the Fourteenth Amendment with the requirements for pleading such a claim sufficient to invoke federal court jurisdiction. This is exemplified in the *Mitchell* case, *supra*, wherein the court found the plaintiff's claim that an eligibility rule, which applied unequally to two classes of students, did not state a cognizable claim for a violation of the Equal Protection Clause:

"Upon examination, it is 'very plain' that this contention is without merit. The classification made by the eligibility regulation is neither inherently suspect nor an encroachment on a fundamental right. On the other hand it is grounded in, and reasonably related to, a legitimate state interest."

*Mitchell v. Louisiana High School Athletic Ass'n*, 430 F.2d at 1156 (footnotes omitted). Clearly, such an observation could only be made after an examination of the merits of the case and a determination of the appropriate standard for review of the challenged classification, all of which could only occur *after* the court had assumed jurisdiction over the cause.

Whatever the validity of those decisions, this Court does not deem them controlling in view of contrary authority in this circuit; in addition, the Court does not find the claim alleged in plaintiff's complaint to be frivolous or insubstantial on its face. In *Brenden v. Independent School Dist. 742*, 477 F.2d 1292 (8th Cir. 1973), the Eighth Circuit rejected the argument that eligibility rules governing participation in interscholastic athletic activities cannot be subjected to the requirements of the Equal Protection Clause because "interscholastic athletics is a privilege and not a right." *Id.* at 1297. Reviewing the observations of courts and commentators as to the significant role education plays in the development of an individual, the *Brenden* court quoted with approval the Minnesota Supreme Court's comment that "[i]nterscholastic activities * * * are today * * * recognized as an important and integral facet of the * * * education process." *Id.* at 1298 (quoting *Thompson v. Barnes*, 294 Minn. 528, 200 N.W.2d 921, 926 n. 11 (1972)). Consequently, the court concluded "that at the very least, the plaintiffs' interest in participating in interscholastic sports is a substantial and cognizable one . . . [and that the] case [was] properly before a federal court to determine if the High School League's actions [were] in conformity with the Equal Protection Clause." *Id.* at 1299. Plaintiff may not have a "right" to participate in interscholastic athletic competition, but she has a right to have any request she may make to participate in such competition reviewed in a manner and under rules which do not violate the Equal Protection Clause. Therefore, this Court concludes that plaintiff's action is properly before the Court under 28 U.S.C. § 1343, and that MSHSAA's motion to dismiss should be denied.[1] *Accord Morris v. State Bd. of Educ.*, 472 F.2d at 1209; *Gilpin v. Kansas State High School Activities Ass'n, Inc.*, 377 F.Supp. at 1237; *Baltic Indep. School Dist. No. 115 v. South Dakota High School Activities Ass'n*, 362 F.Supp. 780, 783 (D.S.D. 1973); *Bucha v. Illinois High School Ass'n*, 351 F.Supp. at 72–73; *Kelley v. Metropolitan County Bd. of Educ.*, 293 F.Supp. 485, 490 (M.D.Tenn.1968).

### 2. MSHSAA's Transfer Rule Does Not Violate The Equal Protection Clause

Plaintiff attacks the constitutional validity of the transfer rule because it applies only to athletic activities, and not to the non-athletic activities of speech and debate, music, and cheerleading. She does not contend that the classifications created by the rule—athletic activities and non-athletic activities—are based upon "suspect" criteria [i. e., race or alienage, *see generally Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) and *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971)], or that the rule infringes upon or trammels a "fundamental right" [i. e., voting or travel, *see generally Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 86

---

1. Apart from a challenge to this Court's jurisdiction, MSHSAA also contends plaintiff's complaint should be dismissed because it failed to state a claim upon which relief can be granted, and because MSHSAA has not been properly served. The Court's discussion in the text, Part II–1–B, adequately demonstrates that plaintiff's complaint does not fail to state to a cognizable claim for relief under the Fourteenth Amendment. In addition, the federal marshal's service return form shows that service of process was effected on Jack Miles, executive secretary of MSHSAA, on December 3, 1980, in accordance with Fed.R.Civ.P. 4(d)(3). Accordingly, the Court finds no merit in these arguments.

S.Ct. 1079, 16 L.Ed.2d 169 (1966) and *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974)]. Although education, as previously noted, serves a significant function in our contemporary society, the United States Supreme Court has declined to rule that an individual has a "fundamental" right to an education:

> "Education, of course, is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected."

*San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. at 35, 93 S.Ct. at 1297, 36 L.Ed.2d at 44; *see generally*, J. Nowak, R. Rotunda & J. Young, Handbook of Constitutional Law 684–86 (1978).

 When governmental laws or actions do not affect fundamental rights or burden suspect classes, the Supreme Court has reviewed their validity under the Equal Protection Clause by application of the rational-relationship test. *See generally Parham v. Hughes*, 441 U.S. 347, 351–52, 99 S.Ct. 1742, 1745–1746, 60 L.Ed.2d 269, 274–75 (1979); *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312–14, 96 S.Ct. 2562, 2566–2567, 49 L.Ed.2d 520, 524–25 (1976); *City of New Orleans v. Dukes*, 427 U.S. 297, 303–04, 96 S.Ct. 2513, 2516–2517, 49 L.Ed.2d 511, 516–17 (1976). Plaintiff all but concedes that the rational-relationship test is the appropriate test for review of the transfer rule and this Court so finds. The Supreme Court concluded in *San Antonio Indep. School Dist., supra*, that a state law affecting the important interest of education should be tested under the rationality standard. *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. at 39, 93 S.Ct. at 1300, 36 L.Ed.2d at 46–47. Furthermore, other courts have determined that ineligibility transfer rules, like the one in question

here, should be reviewed under the rational relationship test. *See Walsh v. Louisiana High School Athletic Ass'n*, 616 F.2d at 160; *Mitchell v. Louisiana High School Athletic Ass'n*, 430 F.2d at 1158–59; *Bucha v. Illinois High School Ass'n*, 351 F.Supp. at 73. Under this standard of review, a challenged governmental action, law or rule "must be sustained if the classification itself is rationally related to a legitimate governmental interest." *United States Dep't of Agriculture v. Moreno*, 413 U.S. 528, 533, 93 S.Ct. 2821, 2825, 37 L.Ed.2d 782, 787 (1973); *see generally Dandridge v. Williams*, 397 U.S. 471, 485–86, 90 S.Ct. 1153, 1161–1162, 25 L.Ed.2d 491, 501–02 (1970); *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487–90, 75 S.Ct. 461, 464–466, 99 L.Ed. 563, 571–73 (1955).

### (a) Under-inclusiveness

 Plaintiff acknowledges that prevention of recruiting abuses is a legitimate governmental objective and that MSHSAA's transfer rule is related to that objective, but she contends that the transfer rule is constitutionally irrational because it is "under-inclusive", i. e., it fails to reach possible recruiting abuses in the areas of non-athletic activities.[2] "An under-inclusive classification contains all similarly situated people, but excludes some people who are similar to them in terms of the purpose of the law." J. Nowak, R. Rotunda & J. Young, *supra* at 521; *see generally*, Tussman & Tenbrock, *The Equal Protection of the Laws*, 37 Cal.L.Rev. 341, 346–53 (1949). All the evidence presented to the Court at the hearing clearly established that member schools of MSHSAA have deliberately chosen not to extend the transfer rule to non-athletic activities, because no noticeable recruiting abuses or school-jumping have occurred in those areas, while such problems have surfaced in athletic competition. *See*

---

**2.** Plaintiff also argues that the transfer rule is not rationally related to its stated objective of preventing the displacement of willing and able student competitors at transferee schools, because it does not extend to transfer students competing in non-athletic activities and thus fails to prevent displacement in such areas. The Court has found that displacement is only

a secondary concern of the rule and not its paramount objective. *See* FF 17. In any event, to the extent that the rule is measured by its effectiveness in responding to the displacement problem, the Court finds it is not unconstitutionally under-inclusive for the reasons set forth in the text. *See* note 3 *supra*.

FF 18. Indeed, the establishment of MSHSAA was prompted, in great part, by the concern of junior and senior high school officials over the existence of such practices—recruiting and school-jumping—in the arena of interscholastic sports.

The absence of a similar history of abuses in non-athletic activities is a more than adequate basis for the exclusion of such activities from the automatic ineligibility bar of the transfer rule. Plaintiff suggests that the *potential* for abuses exists in non-athletic activities, and she speculates that such abuses may in fact have occurred but gone undetected; assuming, arguendo, the accuracy of these observations, the narrow focus of the rule is, nevertheless, justified and validated by the historical data which gave rise to its adoption. Moreover, the rule's objective of deterrence of recruiting abuses is not forfeited in the areas of non-athletic activities or in those cases which fall under an exception to the rule (situations manifesting an absence of choice, promotion, or hardship circumstances, *see* FF 15), because another general rule of the Association proscribes recruiting or school-jumping in *all* interscholastic activities and penalizes individuals who commit such practices upon documentation of the same. *See* FF 15. Since this general rule, unlike the athletic transfer rule's automatic provision of ineligibility, renders a transfer student ineligible only upon proof of a recruiting violation, some violations might go unpunished. But, as the Supreme Court has observed, such an imperfection does not render a rule constitutionally defective:

"[T]he law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is

an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it. *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. at 487–88 [75 S.Ct. at 464–465] 99 L.Ed. at 572.

\* \* \* \* \* \*

"In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect.... 'The problems of government are practical ones and may justify, if they do not require rough accommodations—illogical, it may be, and unscientific.' " *Dandridge v. Williams*, 397 U.S. at 485, 90 S.Ct. at 1161, 25 L.Ed.2d at 501 & 502 (quoting *Metropolis Theater Co. v. City of Chicago*, 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730, 734 (1913)).

Thus, the Court finds that the rule is not constitutionally under-inclusive.[3]

### (b) Over-inclusiveness

Plaintiff seems to also attack the transfer rule because it reaches cases in which its prohibitive force is unnecessary, and is thus overbroad or over-inclusive. "A law may be said to be over-inclusive when the legislative classification includes all persons who are similarly situated in terms of the law plus an additional group of persons." J. Nowak, R. Rotunda & J. Young, *supra*, at 521; *see generally* Tussman & Tenbrock, *supra*. The evidence in this case clearly establishes that plaintiff was not recruited and that her transfer decision was based on valid reasons not related in any way to participation in Sunset's interscholastic athletic program. *See* FF 7. Indeed, there is

---

**3.** The secondary objective, displacement, which the Court discussed in note 2 *supra*, is not entirely satisfied by the classification drawn by the transfer rule. Put another way, the rule is under-inclusive as to this objective, since transfer students may immediately compete in non-athletic activities and may, thus, possibly displace other interested students at the transferee school. Since the Court has found that the transfer rule was adopted primarily to remedy the evil of recruiting abuses, the rule's failure to fully address the displacement problem is not fatal to its constitutionality:

"[T]he reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.... The legislature may select one phase of one field and apply a remedy there, neglecting others." *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. at 489, 75 S.Ct. at 465, 99 L.Ed. at 573 (citations omitted).

"It is no requirement of equal protection that all evils of the same genus be eradicated or none at all." *Railway Express Agency v. New York*, 336 U.S. 106, 110, 69 S.Ct. 463, 465, 93 L.Ed. 533, 539 (1949).

no reason to suspect that Sunset ever has or ever would engage in "recruiting" actions, since its athletic program is distinctly subordinate, in priority, to its academic program. See FF 8. Accordingly, plaintiff argues that application of the rule's ineligibility bar to her, and other transfer students similarly situated like herself, is unreasonable, because it is manifestly clear that the rule's objectives will not be frustrated or endangered in any way by her immediate participation in interscholastic athletic competition as a member of Sunset's sport teams. Since the rule carves out various cases which are exempted from the ineligibility bar—promotions, situations in which no "choice" was exercised, and cases of hardship, plaintiff contends that the rule should provide a mechanism whereby individuals such as herself could be exempted from the ineligibility bar.[4]

In essence, plaintiff's quarrel is with MSHSAA's failure to provide an individualized system of review for transfer students. This failure undisputably results in the application of the ineligibility bar to deserving students who were neither recruited nor were engaged in school-jumping. MSHSAA's executive secretary testified that individualized review of every student transfer would be practically impossible. The Association's full-time staff is relatively small, and they are responsible for performing various other administrative functions associated with the activities of member schools of MSHSAA. Although MSHSAA did not introduce any evidence of the specific or approximate number of student transfers which occur annually, the Court notes that even a conservative estimate of one transfer for each of MSHSAA's 750 member schools would produce a rather substantial number of cases for individualized review. Moreover, the Association's claim that administrative difficulties are inherent in such a system of review is borne out by the history of the unworkability of a similar rule which utilized a certification process involving school principals during the years 1942 to 1951. See FF 19.

Even if administrative difficulties are associated with an individualized system of review, plaintiff argues that this is not a sufficient constitutional basis to justify the over-inclusive reach of the present rule. As support for this proposition, she cites the Supreme Court's decision in Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). The Shapiro Court did not hold that administrative convenience or efficiency cannot constitutionally serve as a basis for a classification which neither affects fundamental rights or burdens a suspect class; rather, it held that a classification which burdened the fundamental right to travel could only be sustained if it promoted a compelling governmental interest, and that administrative convenience alone did not constitute such an interest. See id. at 633–38, 89 S.Ct. at 1330–1333, 22 L.Ed.2d at 614–17. Quite to the contrary of plaintiff's contention, the Supreme Court has expressly held that administrative concerns are an adequate constitutional basis for broad, prophylactic rules which are subject to review under the rational relationship test:

> "The administrative difficulties of individual eligibility determinations are without doubt matters which Congress may consider when determining whether to rely on rules which sweep more broadly than the evils with which they seek to deal.... The Constitution does not preclude such policy choices as a price for conducting [social, economic or welfare] programs.... [S]uch programs do not involve affirmative Government action which seriously curtails important liberties cognizable under the Constitution. There is thus no basis for our requiring individualized determinations when Congress can rationally conclude not only that generalized rules are appropriate to its purposes and concerns, but also that

**4.** Plaintiff, like any transfer student, did have the opportunity to seek a special exemption to the rule under the "hardship" provision of MSHSAA's constitution; the Board of Control, however, concluded that plaintiff's case was not one of hardship warranting the suspension of the rule. See FF 8, 9 & 16.

the difficulties of individual determinations outweigh the marginal increments in the precise effectuation of congressional concern which they might be expected to produce."

*Weinberger v. Salfi*, 422 U.S. 749, 784 & 85, 95 S.Ct. 2457, 2476, 45 L.Ed.2d 522, 550 (1975) (citations omitted).

The Court is not insensitive to the rather harsh, and seemingly unfair, impact a broad rule such as the transfer rule has upon an individual, like plaintiff, who clearly presents none of the evils or concerns at which the rule is aimed. Plaintiff has valid and commendable interests in securing the fullest educational experience possible and in improving her prospects for admission to a prestigious university or college. *See* FF 7, 10 & 22. But those interests are not entirely foreclosed, nor do they appear to be substantially impaired; plaintiff may participate in the practice sessions of Sunset sports teams during this school year (1980–81), and she, of course, will be free to compete in both her junior and senior years at Sunset (1981–82 & 1982–83). "If [a] classification has some 'reasonable basis', it does not offend the Constitution simply because the classification 'is not made with mathematical nicety *or because in practice it results in some inequality.*'" *Dandridge v. Williams*, 397 U.S. at 485, 90 S.Ct. at 1161, 25 L.Ed.2d at 501–02 (emphasis added) (quoting *Lindsley v. Natural Carbolic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369, 377 (1911)).

Indeed, the Supreme Court has upheld laws producing results more harsh then the result of this Court's ruling. In *Weinberger v. Salfi, supra,* a congressional scheme which effectively denied social security benefits to a certain class of surviving wives was sustained against an equal protection challenge. And in *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), a state law mandating the retirement of state police officers at the age of 50 years was also held constitutional under a rationale which is noteworthy here:

"That the State chooses not to determine fitness more precisely through individualized testing after age 50 is not to say that the objective of assuring physical fitness is not rationally furthered by a maximum-age limitation. *It is only to say that with regard to the interest of all concerned, the State perhaps has not chosen the best means to accomplish this purpose.* But where rationality is the test, a State 'does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect.' *Dandridge v. Williams*, 397 U.S., at 485, 90 S.Ct. 1153 [at 1161], 25 L.Ed.2d 491.

We do not make light of the substantial economic and psychological effects premature and compulsory retirement can have on an individual; nor do we denigrate the ability of elderly citizens to continue to contribute to society. The problems of retirement have been well documented and are beyond serious dispute. *But '[w]e do not decide today that the [Massachusetts statute] is wise, that it best fulfills the relevant social and economic objectives that [Massachusetts] might ideally espouse, or that a more just and humane system could not be devised.'* Id., at 487, 90 S.Ct. 1153 [at 1162] 25 L.Ed.2d 491. We decide only that the system enacted by the Massachusetts Legislature does not deny appellee equal protection of the laws."

*Id.* at 316–17, 96 S.Ct. at 2568, 49 L.Ed.2d at 526–27 (emphasis added). Therefore, the Court concludes that the transfer rule is not constitutionally over-inclusive.

### (c) Arbitrariness

Defendants Sunset and H. John Stander have suggested that the transfer rule is irrational because the "promotion" exception to the ineligibility bar is arbitrarily drawn. They note that plaintiff would be now eligible to compete if Notre Dame, the school from which she transferred at the close of her ninth grade of education, grouped the ninth grade in its junior high school rather than in its senior high school. Since Notre Dame includes the ninth grade

in its senior high school, plaintiff was not transferring between units of education and thus did not qualify for the promotion exception. MSHSAA suggests that Sunset and Mr. Stander have no standing to attack the transfer rule, since they are defendants herein and are obligated under MSHSAA's constitution and bylaws to enforce and uphold the Association's rules. While MSHSAA may be technically correct in its position, the Court notes that Sunset and Stander are nominal parties only, whose presence was required to give practical effect to any injunctive relief the Court might award; and, in any event, their challenge to the promotion exception is easily met.

It is obvious that member schools of MSHSAA recognized that transfers between units of education, distinct and discrete in their curricular structure, are normal positive steps in the educational process which should not be discouraged by a penalty such as ineligibility for athletic competition. The formulation of the exception in terms of promotion from the highest grade of a junior high school or elementary school, rather than in terms of particular grades (e. g., ninth or sixth) merely reflects the observation of MSHSAA members that school systems do not *uniformly* divide grades of education into accepted educational units. Differing systems of grouping curriculum units required some flexibility in the Association's definition of "promotion". The Court does not find this flexibility to be arbitrary or irrational. (Parenthetically, the Court notes that the argument of Sunset and Stander rests on the assumption that there is no "curricular" significance in Notre Dame's decision to include the ninth grade in its senior high school rather than in its junior high school, an assumption which seems to be at odds with common educational thinking and for which no proof was offered in this case.)

Therefore, the Court finds that MSHSAA's transfer rule does not deprive plaintiff of her right to equal protection of the laws under the Fourteenth Amendment. The Court notes that this decision is in no way unprecedented; similar rules of other state athletic or activities associations, which render transfer students ineligible to compete for a period of 365 days, have been upheld against equal protection challenges. *See, e. g., Walsh v. Louisiana High School Athletic Ass'n*, 616 F.2d at 158–59; *Mitchell v. Louisiana High School Athletic Ass'n*, 430 F.2d at 1158–59; *Bucha v. Illinois High School Ass'n*, 351 F.Supp. at 73–75; *Kentucky High School Athletic Ass'n v. Hopkins County Bd. of Educ.*, 552 S.W.2d 685, 688–89 (Ky.App.1977).

### 3. The Transfer Rule Is Not Unreasonable, Arbitrary or Capricious

■ Plaintiff also seeks invalidation of the transfer rule on the basis that it is "unreasonable," "arbitrary" or "capricious". She does not expressly bring this claim under the rubric of any particular constitutional principle or guarantee, and, to some extent, this argument is merely a restatement of her contention that the transfer rule is overbroad or over-inclusive. If the thrust of this claim is the unreasonableness of the transfer rule's sweeping breadth and its application to plaintiff, the Court's discussion in Part II–2–(b), *supra* demonstrates why that argument cannot succeed.

Alternatively, this attack may be perceived as a claim based on state law applicable to associations such as MSHSAA, since plaintiff cites a decision of the Missouri Court of Appeals in which another rule of MSHSAA (unrelated to this case) was challenged, and in which an unreasonable and arbitrary rule was defined as one "without a rational ground or justification." *Art Gaines Basketball Camp, Inc. v. Houston*, 500 S.W.2d 735, 741 (Mo.App.1973). Again, the Court believes that its equal protection discussion above more than adequately demonstrates that the transfer rule and its stated exceptions are supported by rational grounds and justifications. In this connection, the Court notes that Missouri's courts, like the courts of most states, recognize only a very narrow role for judicial review of the actions of an association such as MSHSAA:

"The power of a court to review the quasi-judicial actions of a voluntary association is extremely limited. It is limited to determining: (1) whether there are inconsistencies between the association's charter and by-laws and any action taken in respect to them . . . ; (2) whether the member has been treated unfairly, i. e.: denied notice, hearing, and an opportunity to defend himself; . . . (3) whether the association undertakings were prompted by malice, fraud or collusion, . . . and, (4) whether the charter or by-laws contravene public policy or law . . . ."

*State ex rel. Missouri State High School Activities Ass'n v. Schoenlaub*, 507 S.W.2d at 357 (quoting *State ex rel. National Junior Colleges Athletic Ass'n v. Luten*, 492 S.W.2d 404, 407 (Mo.App.1973) (citations omitted)); *see generally* 6 Am.Jur.2d, *Associations and Clubs* § 27 (1963) and cases cited therein.

None of these areas of review has revealed any basis for this Court to find the transfer rule invalid or its application to plaintiff unlawful. First, the Court has found no inconsistency between MSHSAA's stated rules and their application to plaintiff; she is a transfer student whose case does not fall within any stated exception to the rule, but rather is expressly reached by the rule. *See* FF 15. Plaintiff observes that the rule's application to a student such as her, who is interested in athletic competition and who was not recruited, is inconsistent with the Association's stated general objectives "to ensure that interscholastic activities . . . provide opportunities for youth to acquire worthwhile knowledge, skills and emotional patterns," MSHSAA Constitution, Article II, § 3(a), and to "assur[e] fairness to all students." *Id.*, Article VIII, § 8. As the Court previously concluded, however, this "inconsistency" is a result of the lack of 'mathematical precision' in the transfer rule, a defect which does not constitutionally condemn the rule. Secondly, plaintiff has never contended that she was not afforded full and fair access to the 'appeal process' provided by MSHSAA's by-laws, *see* FF 8–9; she has contested the absence of a procedure for an individualized review of her case, but this is an issue on which the Court has already ruled against her. *See* Part II–2–(b), *supra*. Third, there has been no claim of collusion, fraud or malice, and the evidence reveals none. Fourth, the Court has found that the transfer rule does not violate the Fourteenth Amendment's guarantee of equal protection, and the Court is unaware of any other public policy or law with which the rule is not consistent.

Plaintiff's claim that the application of the transfer rule to her is arbitrary is answered by the South Carolina Supreme Court's comment in *Bruce v. South Carolina High School League*, 258 S.C. 546, 189 S.E.2d 817 (1972):

"In contending that, since they were not recruited and the rule was designed to prevent recruiting, it should not apply to them, respondents confuse the reasons which prompted the adoption of the rule with the method adopted to accomplish the desired goal. Prohibitive administrative difficulties, as well as others, resulting from a determination in each case of the reason prompting the transfer could have properly influenced the member schools to decide that the best method to accomplish the elimination of the evil of recruiting was to bind themselves to adherence to a rule without exceptions or qualifications. The merits of such a rule or the wisdom of its adoption are not for the courts to determine.

The action of the League in declaring respondents ineligible to participate in interscholastic athletics was not arbitrary. The action taken was strictly in accord with the lawfully adopted rules of the League, by which all members agreed to be bound."

*Id.* 189 S.E.2d at 819; *accord Kentucky High School Athletic Ass'n v. Hopkins County Bd. of Educ.*, 552 S.W.2d at 687–88; *Tennessee Secondary School Athletic Ass'n v. Cox*, 221 Tenn. 164, 425 S.W.2d 597, 602 (1968).

Finally, the Court notes that plaintiff's claim of arbitrariness, unreasonableness and

capriciousness might be construed as a claim that the transfer rule violates her right to due process of law under the Fourteenth Amendment. It is now clear that a student's interest in a public education is a "property" interest which cannot be deprived without the provision of notice and hearing procedures which comport with the Due Process Clause of the Fourteenth Amendment. *See Goss v. Lopez,* 419 U.S. 565, 573–76, 95 S.Ct. 729, 735–737, 42 L.Ed.2d 725, 734–36 (1975). And participation in interscholastic athletic competition is, as previously noted, an important component of a modern education, and thus it may be argued that such competition is entitled to the procedural safeguards required by the Due Process Clause. Courts which have addressed this issue have determined that a student's interest in interscholastic competition does not merit the salutary procedural protections afforded by the Due Process Clause. *See Walsh v. Louisiana High School Athletic Ass'n,* 616 F.2d 159–60, and cases cited therein.

■ Assuming, arguendo, that plaintiff's interest in athletic competition is a property interest protected by the Due Process Clause, the Court does not believe that plaintiff has been denied her right to procedural due process by MSHSAA's rules and action. She had reasonable notice of the Association's rules, *see* FF 8; she was given an opportunity to petition the Association's Board of Control for an exemption from the rule's ineligibility bar under the "hardship" exemption; and the Board heard her appeal at a hearing and then issued its decision denying her request. *See* FF 9. It is true that MSHSAA's rules did not provide plaintiff an opportunity to rebut the irrebutable presumption implicit in the transfer rule, namely, that all transfer students who desire to compete in interscholastic athletics immediately after their transfer were recruited or decided to transfer for athletic reasons. Nevertheless, the Supreme Court has held that legislative rules, which do not affect fundamental rights or burden suspect classes, may regulate through the application of broad standards that embody such evidentiary presumptions. *See Wein-*

*berger v. Salfi,* 422 U.S. at 770-73, 95 S.Ct. at 2469-2471, 45 L.Ed.2d at 542-43. Therefore, the Court finds that MSHSAA's transfer rule does not contravene the Due Process Clause.

### 4. Plaintiff Is Not Entitled to the Issuance Of A Preliminary Injunction

■ Until recently, the standards governing the issuance of a preliminary injunction in this circuit were well settled. A party seeking injunctive relief had the burden of showing either:

> "(1) probable success on the merits *and* possible irreparable injury, *or*
>
> (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief."

*Dakota Wholesale Liquor, Inc. v. Minnesota,* 584 F.2d 847, 848 (8th Cir. 1978) (quoting *Sonesta Int'l Hotels Corp. v. Wellington Assocs.,* 483 F.2d 247, 250 (2d Cir. 1973) (emphasis in original)); *accord Campbell "66" Express, Inc. v. Rundel,* 597 F.2d 125, 127 (8th Cir. 1979); *Modern Controls, Inc. v. Andreadakis,* 578 F.2d 1264, 1267 & n. 4 (8th Cir. 1978); *Fennell v. Butler,* 570 F.2d 263, 264 (8th Cir.), *cert. denied,* 437 U.S. 906, 98 S.Ct. 3093, 57 L.Ed.2d 1136 (1978). As Chief Judge John W. Oliver of this District pointed out in a recent opinion, application of those alternative standards has not been a matter of ease or clarity. *See ABA Distributors, Inc. v. Adolph Coors Co.,* 496 F.Supp. 1194, 1195-97 (W.D.Mo.1980). Moreover, two recent decisions of the Eighth Circuit have given rise to some uncertainty as to whether a district court is free to select either of these alternative standards. *See Dataphase Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109 (8th Cir. 1980); *Rittmiller v. Blex Oil, Inc.,* 624 F.2d 857 (8th Cir. 1980).

In *Rittmiller,* the Eighth Circuit noted that "this circuit has not fully resolved the articulation of guidelines to be used by the district courts in ruling requests for a preliminary injunction." 624 F.2d at 860. The

Court went on to emphasize that, although the use of alternative standards was endorsed by a panel of the Eighth Circuit in *Fennell v. Butler, supra,* this circuit has never abandoned the traditional equity principle that a party moving for preliminary injunctive relief must demonstrate the likelihood of irreparable injury:

> "[A] showing on a preliminary injunction that the balance of immediate hardships tips in favor of plaintiffs 'does not eliminate the basic obligation of the plaintiff to make a clear showing of the threat of irreparable harm.... In sum, the balancing of hardships test ... necessarily includes the showing of irreparable harm.'"

*Id.* at 861 (quoting *Triebwasser & Katz v. American Tel. & Tel. Co.,* 535 F.2d 1356, 1359 (2d Cir. 1976)). In *Dataphase,* the Eighth Circuit held that a district court should not have entered an injunction which prohibited a corporation from exercising its First Amendment right to commercial speech without first assuring that the movant could satisfy the "traditional" test for injunctive relief: "The District Court did not find that Dataphase would suffer irreparable harm, nor did it find a substantial likelihood that the statements made by CLSI were false or misleading." 640 F.2d at 114.

The significance of *Rittmiller* and *Dataphase* is their emphasis on the irreparable harm requirement: "*Rittmiller* and *Dataphase* make[ ] clear that the Second Circuit standard [the alternative preliminary injunction test] ... does not attempt to eliminate the necessity that a plaintiff seeking preliminary injunctive relief make an appropriate irreparable harm showing before such relief may properly be granted." *ABA Distributors, Inc. v. Adolph Coors Co.,* 496 F.Supp. at 1197. This refinement, if indeed it is such,[5] is not material to the

Court's decision herein. Although, as defendant MSHSAA notes, plaintiff's interest in admission to a prestigious university or college is too "speculative" and "uncertain" an interest to support the issuance of a preliminary injunction, *see State ex rel. Missouri State High School Ass'n v. Schoenlaub,* 507 S.W.2d at 359, she also has an interest in participating in interscholastic athletics as a member of Sunset sports teams, for her personal and educational enrichment. This interest most certainly will be partially lost when the current basketball season comes to an end; and, since plaintiff also wishes to compete as a member of Sunset's track team in the spring of 1981, the "remainder" of her interest in being a Sunset athletic competitor during the 1980–81 school year will also be irreparably forfeited at the close of the track season, unless a preliminary injunction issues before then. On the other hand, if an injunction does issue, there is a considerable likelihood that the uniformity that currently prevails in the activities and contests of member schools of MSHSAA would dissipate. The transfer rule occupies a central role in MSHSAA's regulatory scheme in the area of athletic competition. If enforcement of the rule was preliminarily enjoined, recruiting activities and school-jumping transfers might occur which would require MSHSAA's staff to maintain a careful, and possibly costly, investigatory vigil[6] and/or would enable some students and coaches to circumvent the rule's salutary objectives with impunity. On balance, the Court believes that the hardships, and the possibilities of irreparable harm, are nearly equal, or perhaps, tipped slightly in plaintiff's favor.

The dispositive factor, however, is not the likelihood of irreparable harm, but rather plaintiff's inability to demonstrate either "probable success on the merits" or "suffi-

---

5. The Eighth Circuit previously had noted that a "showing [of] ... irreparable harm ... [is] the *sine qua non* for all injunctive relief." *Frejlach v. Butler,* 573 F.2d 1026, 1027 & n. 4 (8th Cir. 1978).

6. The suspension of the transfer rule's ineligibility bar would not leave MSHSAA "unarmed" to respond to possible recruiting abuses or school-jumping, because the Association's general rule prohibiting recruiting authorizes the imposition of penalties by the Association, upon proof of a violation. *See* FF 15.

ciently serious questions going to the merits to make them fair ground for litigation." As the foregoing memorandum demonstrates, an overwhelming majority of case precedents suggest that there is little, if any, chance that plaintiff's constitutional challenges would succeed on the merits, after a final evidentiary hearing. Therefore, the Court finds that plaintiff has not satisfied either of this circuit's alternative tests for the issuance of a preliminary injunction; accordingly, her motion for such relief must be denied.

## CONCLUSION

The Court has found that MSHSAA's transfer rule, rendering a transfer student, with few exceptions, ineligible to compete in interscholastic athletic competition for a period of 365 days, does not violate the Equal Protection Clause of the Fourteenth Amendment, nor constitute an unreasonable, arbitrary and capricious rule, on its face or in its application to the plaintiff. In so finding, the Court does not denigrate the significance of plaintiff's interests in interscholastic athletic competition at the Sunset Hill School, nor does the Court question the sincerity of plaintiff's expression of that interest. To be sure, the rule has produced a somewhat harsh result in this case and such a result might later be repeated. The wisdom of the rule may be questioned, but this Court is not free to invalidate the rule on that basis; "[w]e are unwilling to assume for ourselves a level of wisdom superior to that of ... educational authorities." *San Antonio School Dist. v. Rodriguez*, 411 U.S. at 55, 93 S.Ct. at 1308, 36 L.Ed.2d at 56. Mr. Justice Frankfurter once observed that "[i]n applying the equal protection clause ... we must be fastidiously careful ... that we do not 'sit as a super legislature'." *Morey v. Doud*, 354 U.S. 457, 475, 77 S.Ct. 1344, 1355, 1 L.Ed.2d 1485, 1497 (1957) (dissenting opinion). Under MSHSAA's constitution, any one of its member schools may initiate an "amending" process which will bring proposals for revisions of rules before the entire membership for a vote. *See* FF 21. With this "legislative" remedy available, the Court declines to act as a "super legislature" or a "super administrator."

Accordingly, it is hereby

ORDERED that defendant MSHSAA's motion for dismissal is denied; and it is further

ORDERED that plaintiff's motion for a preliminary injunction is denied; and it is further

ORDERED that, on or before January 5, 1980, all parties shall file a joint report indicating whether any party wishes to either conduct discovery or present additional evidence at a final hearing on the merits of plaintiff's request for injunctive relief.